Harrison H. SMITH, Helen Smith and Ronald Harrison Smith, Plaintiffs,

v.

Joseph L. GARRETT, Charles Christopher and Robert G. Koehler, Jr., Defendants.

Civ. A. No. 80–0425–E.

United States District Court, N.D. West Virginia.

April 30, 1984.

LaVerne Sweeney, Grafton, W. Va., for plaintiffs.

Herbert G. Underwood of Steptoe & Johnson, Clarksburg, W.Va., for state defendant Garrett.

Betsy Steinfeld, Asst. U.S. Atty., Wheeling, W.Va., for federal defendants Koehler and Christopher.

## MEMORANDUM OPINION

GORDON, Senior District Judge *.

Plaintiffs, Harrison Smith, his wife, Helen Smith, and their son, Ronald Smith, brought this civil action against three state and federal law enforcement officers. The plaintiffs claim that they suffered various violations of their constitutional rights when they were arrested, and vehicles on their property were seized, during an investigation that recovered five allegedly stolen cars. A trial on these claims was held February 1 and 2, 1984. After considering the evidence, pleadings, and proposed findings, the Court has concluded that plaintiffs have failed to demonstrate any violation of their constitutional rights. Their complaint will therefore be dismissed.

## FACTS

Plaintiff Ronald Smith owns and operates a business known as Smith Motor Sales. Ronald is regularly assisted in the business by his father, Harrison Smith, and occasionally assisted by his mother, Helen Smith. The business, which is located on Route 50 in Preston County, West Virginia, sells both new and used cars. On the afternoon of September 15, 1978, defendant J.L. Garrett, a Trooper with the West Virginia State Police, and co-defendant Charles Christopher, a Special Agent with the Elkins Office of the Federal Bureau of Investigation, stopped at Smith Motor Sales to investigate a report that the Smiths had stolen vehicles in their inventory. Garrett had received information that two cars previously purchased from the Smiths by a North Carolina car dealer had been reported as being stolen from a Ford Motor Company testing facility in Michigan.

Upon their arrival at the business, Garrett and Christopher were met by Harrison and Ronald Smith. The officers identified themselves and asked to inspect the titles and other documents for the vehicles on the lot; they were informed, however, that these documents were not immediately available. Arrangements were made to have the officers return on September 20, 1978, to inspect these papers. While on the lot, Garrett and Christopher inspected all the vehicles on the lot, as well as car frames and other parts. Ronald and Harrison were less than cooperative with the officers during this inspection. In response to the officers' request to inspect the cars, the plaintiffs produced only one key at a time, and returned each key to their sales office before securing another key for the officers. During their inspection, Garrett and Christopher obtained the Vehicle Identification Numbers ("VIN") from certain vehicles, and radioed these numbers to the National Crime Information

* The Honorable Eugene A. Gordon, Senior United States District Court Judge for the Middle District of North Carolina, sitting by designation.

Center ("NCIC") to determine whether they had been reported as stolen. This check revealed that there was currently no record of these autos as having been stolen.

Unbeknownst to Garrett and Christopher, co-defendant Robert Koehler, a Special Agent with the Fairmont Office of the Federal Bureau of Investigation, was also pursuing an investigation of stolen vehicles in the Preston County area. He contacted the Smiths at their business on the morning of September 19, 1978. Koehler had information from FBI offices in Charlotte, North Carolina, and Detroit, Michigan, that stolen vehicles had been recovered from a North Carolina dealer who had purchased those same vehicles from Smith Motor Sales.

Upon arrival at Smith Motor Sales, Agent Koehler was told that Garrett and Christopher had visited the lot earlier. This was the first time Koehler learned of the dual investigations. With the grudging cooperation of Ronald and Harrison,[1] Koehler obtained the VIN from five apparently new Ford cars and vans that were on the front of the lot, facing Route 50. Ronald informed Koehler that these cars had been purchased for parts only. All of these vehicles, however, had current West Virginia inspection stickers, which would have permitted their use on public roads. (Defendants' Exhibits 9–13).

Koehler then contacted the Detroit Office of the FBI, which later informed him that the VIN from the five vehicles he had checked at the Smiths' lot corresponded with the VIN of five vehicles that had been reported as being stolen from a Ford test track facility. Around 6:00 P.M. that evening, Koehler contacted Garrett, and for the first time, both officers exchanged the information revealed by their respective investigations. It was decided that an attempt would be made to recover the five

Fords. Koehler contacted a local towing service and instructed it to send two trucks to Smith Motor Sales between 7:30 P.M. and 8:00 P.M. that evening.

Around 8:30 P.M., Koehler, Garrett, and Christopher met near Smith Motor Sales. The tow trucks Koehler had contacted earlier were already present. The five vehicles identified by Koehler as being stolen had been moved from the front of the lot to a position near the rear of the lot, and were now obstructed by other vehicles. The three officers proceeded to the Smith residence, which is located adjacent to the car lot. Mrs. Smith informed the officers that neither her husband nor her son were at home; she was unable to contact them by phone after being asked to do so. She also informed the officers that she did not have authority to release the cars, and that they would have to return later.

Garrett then contacted the Prosecuting Attorney for Preston County and notified him of the situation. It was decided that due to the absence of Ronald and Harrison Smith, and the realignment of the suspect vehicles, search and arrest warrants should be procured.[2] Garrett and Christopher left for Kingwood, West Virginia, to attempt to secure warrants from a West Virginia magistrate; Koehler remained behind to keep the premises secure. Based on the information presented by Garrett and Christopher, Magistrate Joe Serino issued warrants for the arrest of Ronald and Harrison Smith, and the seizure of the suspect autos. (Defendants' Exhibits 1–3).

While Garrett and Christopher were absent, Ronald and Harrison returned home, arriving between 11:15 P.M. and 11:30 P.M. with a male acquaintance. Koehler met Ronald and Harrison in the driveway leading to their home, and informed both that the cars were going to be impounded. Ronald demanded a showing that Koehler had authority to remove the vehicles. Af-

---

1. Agent Koehler was subjected to a routine similar to that suffered by Agent Christopher and Trooper Garrett: The keys to the autos were procured one at a time by the Smiths.

2. Agent Christopher also conferred with the United States Attorney for the Northern District of West Virginia about the situation. The United States Attorney concurred in the recommendation of the state Prosecuting Attorney.

ter what was apparently a short and heated confrontation, Koehler ordered the towing service to prepare to remove the vehicles. In light of this confrontation and his concern for the safety of the civilian tow truck operators, Koehler also proceeded to place his shotgun on the front seat of his car.

Garrett and Christopher then returned to the lot, arriving between 11:30 P.M. and 11:50 P.M. with the warrants in hand. The towing service was then instructed to begin removing the vehicles. All three officers proceeded to the Smith residence, where Trooper Garrett knocked on the front door. When Mrs. Smith answered, Garrett advised her of the warrants, and asked for Harrison and Ronald.[3] Mrs. Smith informed Garrett that they had gone to bed, and she was not going to disturb them.[4]

After being told this, Garrett stepped toward the door. Mrs. Smith tried to push him away by placing her hands on his chest. Garrett grabbed her right hand, and using her momentum, pulled Mrs. Smith out onto the porch. As he entered the house, Garrett instructed Christopher and Koehler to arrest Mrs. Smith for attempting to obstruct the arrests of Harrison and Ronald. Garrett proceeded into the living room, where he was confronted by Harrison, who had assumed a fighting stance. Harrison took a swing at Garrett, who deflected the blow. Harrison then grabbed Garrett.

At about the same time, Ronald Smith had entered the living room, and Mrs. Smith had come in from the porch, followed by Christopher and Koehler. Ronald lowered his head to "ram" Garrett, but was grabbed by Agent Koehler, who then attempted to arrest and handcuff Ronald. Mrs. Smith tried to interfere with Koehler, but she was pushed out of the way by Garrett. Ronald and Mrs. Smith were eventually handcuffed by Koehler and Garrett, and placed in chairs in the living room.

During this time, Christopher was unsuccessfully trying to arrest Harrison Smith. Christopher had succeeded in placing a handcuff on Harrison's right hand, but Harrison had struggled and was now trying to hit Christopher with his left hand. Because of the danger presented by the open cuff dangling from the right hand, Christopher grabbed Harrison's right hand with both hands; Christopher placed his back to Harrison, and brought Harrison's arm over his shoulder and held it in front of him. Agent Koehler came over to assist Christopher by placing a restraining hold on Harrison; at this point, Harrison's elbow was apparently pulled out of its socket.

After the Smiths were arrested and handcuffed, the warrants were read, and they were informed of their rights. It was apparent that Harrison would require medical attention for his arm, so Christopher called the Kingwood jail to notify them that one of the arrestees about to be brought in would require medical assistance. This call was made at 12:09 A.M., September 20, 1978. (Plaintiffs' Exhibit 16).

Warrants for resisting arrest were later obtained against all of the Smiths. In state court, Ronald and Harrison were convicted on these charges. The charges against Mrs. Smith, however, were dismissed due to a fatal variance between the warrant and the proof presented at trial. On appeal to the Supreme Court of Appeals of West Virginia, the convictions of Ronald and Harrison were affirmed, with one judge

---

**3.** Mrs. Smith recognized all three officers, as she had seen them on the car lot during their earlier visits.

**4.** Plaintiffs' and defendants' versions of subsequent events differ greatly. The Court has generally credited defendants' version of the incident, however, because of various inconsistencies in the plaintiffs' testimony. The issue of credibility is best illustrated by the fact that although the Smiths denied that they had any reason to suspect that the vehicles were stolen,

Mrs. Smith had, at 9:15 A.M. on September 15, 1978, stopped payment on a check to the car dealer from whom the vehicles were purchased. The reason for the stop payment was listed as "Bought Stolen Cars". (Defendants' Exhibit 15). This action was taken before the Smiths were visited by any of the defendants, and was apparently precipitated by a conversation between Harrison Smith and the North Carolina car dealer who had bought cars from the Smiths.

dissenting. *State v. Smith*, 289 S.E.2d 478 (W.Va.1982).

## DISCUSSION

Plaintiffs brought this action under 42 U.S.C. § 1983, as well as directly under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution. *See, e.g., Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Jurisdiction is premised upon 28 U.S.C. §§ 1331(a) and 1343. Since both § 1983 actions and *Bivens* actions provide parallel remedies for the redress of violations of constitutional rights, there is no need to analyze separately the various claims presented against each state and federal defendant. This entire episode can be viewed *in toto* to determine whether the defendants violated any of the plaintiffs' constitutional rights.

In sum, plaintiffs' claims may be grouped into three categories: (1) Defendants Garrett and Christopher used constitutionally excessive force in arresting all three plaintiffs; (2) Defendant Koehler ordered the unconstitutional seizure of two vehicles on the plaintiffs' property prior to obtaining search warrants; and (3) The arrest warrants for Ronald and Harrison Smith were constitutionally defective, since they were based on false and inaccurate information.

Before turning to these claims, the Court must address the collateral estoppel effect, if any, of the state court convictions of Ronald and Harrison Smith. Defendants argue that these convictions necessarily determined that the arrests at issue were lawful, thus impliedly rejecting the claims that the warrants were improperly obtained, or that the officers used excessive force in making the arrests.

■ There is no dispute that the doctrine of collateral estoppel can be invoked against a § 1983 claimant to bar relitigation of issues decided against him in a state criminal trial. *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Rimmer v. Fayetteville Police Department*, 567 F.2d 273 (4th Cir.1977). Defendants have not, however, demonstrated that the prior criminal convictions "distinctly put in issue and directly determined" the issue of excessive force. *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568, 71 S.Ct. 408, 413, 95 L.Ed. 534 (1951). Defendants have tendered to the Court the transcript of the West Virginia Circuit Court trial in which Ronald and Harrison Smith were convicted of unlawfully resisting arrest. (*See* Federal Defendants Motion for Summary Judgment, Exhibit E). Yet neither this transcript, nor the general verdict tendered by the jury, reveal whether the issues of the warrants' validity or the use of excessive force were "actually and necessarily" considered and resolved by the jury. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

First, the transcript does not indicate whether the Smiths were charged with a statutory or common law offense. Second, the transcript does not include the jury instructions given in the case. Finally, counsel has not furnished, nor has the Court found, West Virginia decisional law describing the elements of the offense with which the Smiths were charged, and any defenses thereto. Without these crucial pieces of information, the Court cannot be certain of the issues necessarily decided by the jury's guilty verdict, and cannot properly apply collateral estoppel theory to plaintiffs civil rights claims. *See Hernandez v. Los Angeles*, 624 F.2d 935 (9th Cir.1980); *Williams v. Liberty*, 461 F.2d 325 (7th Cir.1972); *Kauffman v. Moss*, 420 F.2d 1270, 1274–75 (3rd Cir.), *cert. denied*, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); *cf., Cramer v. Crutchfield*, 648 F.2d 943 (4th Cir.1981) (failure to object to search and seizure at state court trial serves as waiver of challenge to constitutionality of search under § 1983); *Ridley v. Leavitt*, 631 F.2d 358 (4th Cir.1980) (§ 1983 claim of excessive force not collaterally estopped by state court conviction

for assault "since the use of unlawful force ... would not have been a defense to the original assault charge."); *Wiggins v. Murphy*, 576 F.2d 572, 573 (4th Cir.1978) (§ 1983 claim estopped by actual litigation of issue in state trial). Therefore, the Court must review each of plaintiffs' claims on the merits.

## A. EXCESSIVE FORCE

■ The Fourth Amendment's protection against unreasonable searches and seizures has been recognized to prohibit the use of excessive force by law enforcement officers in making an arrest. *Jenkins v. Averett*, 424 F.2d 1228 (4th Cir.1970). Such police action may also be actionable under the Due Process Clause. *Morgan v. Labiak*, 368 F.2d 338 (10th Cir.1966). It deserves mention, however, that not every instance of the use of excessive force gives rise to a constitutional violation; often, such actions will be cognizable only under state criminal or tort law. *See, Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979); *King v. Blankenship*, 636 F.2d 70, 73 (4th Cir. 1980).

The standard to be used in determining whether the use of force has caused a constitutional violation is not easy to delineate. In the Fourth Circuit, various formulations have been suggested. In *Jenkins*, the court found that force used by the police is unconstitutionally excessive if it is "arbitrary" and a "raw abuse of police power." 424 F.2d 1232. In *King*, the court spoke of "unjustified striking, beating, or infliction of bodily harm." 636 F.2d at 72. Recently, the Court of Appeals for this Circuit defined the constitutional substantive due process right as "the right to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court." *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980).

■ This Court is convinced that whatever standard is used, the actions of the police were not constitutionally excessive.

The reasonableness or excessiveness of the force used to effect an arrest must, of course, be considered in light of the circumstances as they appeared at the time of the arrest. *Samuel v. Busnuck*, 423 F.Supp. 99, 101 (D.Md.1976); *see also Prosise v. Haring*, 667 F.2d 1133, 1136 (4th Cir.1981), *aff'd on other grounds*, 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983). In this case, the officers, in attempting to execute facially valid arrest warrants, were confronted with hostile and uncooperative subjects. At various times, all three plaintiffs attempted to hinder and obstruct the officers in the execution of their duty. Mrs. Smith attempted to prevent Garrett's entry into the home; his act of pulling her out onto the porch, even if done forcefully, does not rise to the level of a constitutional violation. The same can be said of Garrett's efforts to prevent Mrs. Smith from obstructing the arrest of her son. Similarly, Ronald Smith attempted to "ram" or tackle Garrett; Garrett and Koehler necessarily had to respond with some force to bring Ronald under control. Finally, Harrison's injury was directly related to his struggle with Christopher. It was imperative that Harrison's right arm be controlled so that he could not swing the loose handcuff as a mace. All three defendants responded with only that force which was reasonable and necessary in light of the resistance which they faced. An arrest, especially of an uncooperative subject, technically involves a "battery". Yet unless the force applied is so unreasonable in light of the situation presented as to be arbitrary, brutal, or shocking, this physical contact does not deprive a person of his or her constitutional rights.

Finally, it should be noted that neither Garrett, Koehler, nor Christopher applied any force after plaintiffs were subdued. Indeed, they made immediate arrangements to take Harrison to the hospital for treatment. Under the circumstances, the force used here in arresting the plaintiffs was not constitutionally excessive. Therefore, no cognizable claim exists under § 1983 or a *Bivens* action.

## B. THE ARREST WARRANTS

Ronald and Harrison Smith also challenge the basis upon which the warrants for their arrest were issued. They claim that the officers had no factual basis upon which to suspect that either of them knew or should have known that the vehicles on their lot were stolen.

■■■ It is clear that an arrest warrant may issue upon less evidence than is necessary to sustain a conviction: all that is required is "probable cause." Probable cause "exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." *Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967); *see also, Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). In sum, the task of the issuing magistrate is to determine, from the totality of the circumstances, whether there is a fair probability of past or current criminal conduct. *Cf., Illinois v. Gates*, 462 U.S. 213, ——, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (probable cause based on information from anonymous informer).

■■■ Measured against these requirements, it is clear that the information presented under oath by Trooper Garrett and Agent Christopher to Magistrate Serino was sufficient to provide probable cause for the issuance of the warrants. Garrett had received information that two cars sold by the Smiths to a North Carolina dealer had been reported as stolen. Furthermore, Garrett had been notified by Koehler that a VIN check on five Fords on the Smith lot revealed that they were stolen. There was no basis to doubt Koehler's reliability or veracity. The subject vehicles, which had previously been displayed in the front of the lot, were now situated at the rear of the lot, and had been obstructed by other vehicles. In addition, Garrett had information suggesting that the Smiths were involved in some suspicious transactions with these cars. His investigation revealed that the North Carolina dealer who had purchased two other cars was told that if he could get these cars titled in North Carolina, the Smiths had other cars to title. Furthermore, although Ronald Smith had informed Garrett that the cars were to be used for parts, the vehicles were originally placed in a conspicuous location on the lot, suggesting they were for sale. Indeed, the vehicles had current West Virginia inspection stickers, which authorized their use on the public roads. These facts, in addition to the absence of title documentation and the generally uncooperative attitude of Ronald and Harrison during Garrett's visit on September 15, certainly provided sufficient probable cause for the issuance of the warrants.[5]

In sum, these felony arrest warrants were based on information clearly establishing probable cause. The warrants thus conveyed the limited authority to enter the Smith residence to effectuate the arrests, since there was reason to believe that Ronald and Harrison Smith were within. *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980).

## C. THE SEIZURE OF THE VEHICLES

Finally, plaintiffs' assert that their constitutional rights were violated when the vehicles in question were towed off the premises prior to Trooper Garrett's return with the search warrant. The Court, however, finds that the evidence, though conflicting, shows only that Agent Koehler

---

5. The Court also notes that Garrett was aware that Harrison Smith had asked for a VIN check on the five Fords through Chief Deputy O'Hagan of the Preston County Sheriff's Department. The NCIC had "no record" of these VIN. (Plaintiffs' Exhibit 13). On the basis of this report, O'Hagan told Harrison that the cars were not stolen. Thus, when Garrett contacted O'Hagan on September 19, O'Hagan claimed that Harrison had no reason to believe the cars were stolen. O'Hagan's claim, however, did not negate the inferences to be drawn from the other facts outlined above.

ordered the vehicles to be prepared for towing some ten to thirty minutes prior to Garrett's return. It was only after Garrett's return that the vehicles were actually removed from the lot. (Ware Testimony; Defendants' Exhibit 7).

The question thus presented is whether such action—which is no doubt a "seizure"—violated plaintiffs' Fourth Amendment rights. The general rule is that searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically established and well-delineated exceptions." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 2172–73, 72 L.Ed.2d 572 (1982), *quoting Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). For the reasons noted below, the Court believes that the seizure was lawful under the circumstances in which Agent Koehler found himself.

It is undisputed that while Garrett and Christopher were obtaining the warrants, Agent Koehler remained behind to secure the premises. When the Smiths returned home between 11:15 P.M. and 11:30 P.M., they were accompanied by a male acquaintance. A heated exchange ensued; Koehler was unsuccessful in getting the Smiths to cooperate in releasing the cars. It was at this point that Koehler ordered the tow trucks to begin to prepare to remove the vehicles. In light of the circumstances that were presented, Koehler was not required to wait for the warrants before taking action to preserve and protect the vehicles for their true owner. The hour was late, Koehler was alone, and the plaintiffs and their acquaintance had the capability to remove the vehicles before the warrants arrived. These factors combined to create a concern for the safety of the vehicles, as well as the safety of the civilian employees of the towing service. While it might have been the wiser course of action to wait for the warrants to arrive, under the circumstances as they then existed, the seizure of the vehicles was not in contravention of the Fourth Amendment. *See, e.g., United States v. Morrow*, 541 F.2d 1229, 1230–32 (7th Cir. 1976), *cert. denied*, 430 U.S. 933, 97 S.Ct. 1556, 51 L.Ed.2d 778 (1977).

Furthermore, the Court perceives some difficulties in the standing of the Smiths to raise the Fourth Amendment issue. In this circuit, for a criminal defendant to establish his standing to contest the search and seizure of allegedly stolen property, he must show that the items were acquired innocently. *United States v. Hargrove*, 647 F.2d 411, 413 (1981); *United States v. Dickerson*, 655 F.2d 559 (1981); *see also United States v. Hensel*, 672 F.2d 578 (6th Cir.), *cert. denied*, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982). This showing would demonstrate that the defendant had a legitimate expectation of privacy in the area or items searched. *See United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). There is no apparent reason why a civil rights plaintiff should not have the same burden when complaining of the seizure of allegedly stolen goods.

The Smiths have failed to meet this burden. They offered no evidence—such as title documentation or bills of sale—that would have suggested their purchases were bona fide. At best, the evidence showed that Harrison Smith had some of the vehicles checked through NCIC; this check revealed that there was "no record", the "vehicle [was] not on file", or that there was an "invalid VIN No." entered. This evidence sheds little light upon the Smiths' bona fides at the time of the initial purchase. Indeed, prior to the seizure, the Smiths acquired information suggesting that the vehicles might have been stolen; this led Mrs. Smith to stop payment for at least one of the autos. While the Court does not rest its decision on plaintiffs' lack of standing, these observations do suggest that the Smiths had a diminished expectation of privacy in the seized vehicles.

## D. CONCLUSION

For the reasons noted, plaintiffs have failed to demonstrate any violation of their constitutional rights, and their complaint will be dismissed in an order entered contemporaneously with this opinion.