[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 82 
The appellant, Kevin Brett Hall, was convicted of robbery in the first degree, see § 13A-8-41, Ala. Code 1975, and was sentenced as a habitual offender to life imprisonment without parole.
Hall contends that the state used its peremptory challenges to strike black prospective jurors in violation of the principles of Batson v.Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
The state used five of its peremptory challenges against black prospective jurors: C.J., R.J., J.M., B.E., and T.P. Hall's lawyer challenged the strikes under Batson, which forbids the use of race as the basis for a peremptory challenge. Without making a specific finding that Hall had made a prima facie showing of racial discrimination, the trial court instructed the prosecutor to state his reasons for striking the black prospective jurors. Without objecting, the prosecutor then gave his reasons. After being given the prosecutor's reasons, and considering argument by Hall's counsel, the trial court denied the Batson motion.
Because the prosecutor stated his reasons for the questioned strikes, the issue whether Hall established a prima facie case of discriminatory use of peremptory challenges is moot. E.g., Hart v. State, 612 So.2d 520,524 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala. 1992), cert. denied,508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). If a party's explanations for its peremptory challenges are a part of the record, those explanations will be reviewed by the appellate courts regardless of the manner in which they came to be in the record. E.g., Huntley v.State, 627 So.2d 1013, 1016 (Ala. 1992); McLeod v. State, 581 So.2d 1144
(Ala.Cr.App. 1990).
The prosecutor gave the following reasons for striking C.J., a black male:
 "[C.J.] is the gentleman who, when asked if he had any moral convictions or ethical beliefs that would bar him from sitting on a jury, he stated that, `If someone is out there that I don't know, I *Page 83 
 could be fair. But if someone is out there that I did know, then, I wouldn't want any part of it, or I wouldn't want to serve.' His response to that question was ambiguous and confusing, and it appeared to me he didn't understand the question that I had asked, even though I thought I was very careful in voir dire when I did ask the question. And because of what I perceive as being his difficulty in understanding voir dire questions, I struck him. I think he ultimately indicated that because he did not know the defendant that he could sit on a jury, but his response to my question had actually nothing to do with the question.
 "And it appeared to me he was confused by the question and what exactly we were asking. And I was concerned that if he ultimately ends up on the jury and the Court has to instruct the jury on the representation of a deadly weapon issue, which will come up in this case, and the effect of intoxication, which may be used as a defense, I didn't know if he would understand those jury charges based on his apparent confusion in voir dire. So, he was struck for those reasons."
(R. 46-47.)
During voir dire examination, the prosecutor had asked the venire the following question:
 "Now, I want to ask you a couple of questions, now, that I don't like asking, and I always feel uncomfortable when I do ask it. They are kind of nosy-type questions, and these are the private response-type questions. If you've got a response, I ask you to tell us privately before Judge Little's bench.
 "First thing is, do any of you have a moral, or religious, or ethical belief or conviction — I don't know what you might call it. Maybe you just call it your plain old gut feeling that tells you, `I can't do what ya'll have brought me here to do. If I sit in a jury box, I simply can't vote guilty or not guilty because my religious faith tells me I'm not supposed to do that.' Or maybe it's not your religion. Maybe, again, it's just your gut feelings, your moral beliefs. I know we are all a little uncomfortable with it always. But I'm asking you, does it violate your principles in any way to sit in a jury box and say guilty or not guilty? Does that trouble you in any way? And, again, it's not unusual for several folks to come up privately and say, `I have some concerns about that.' And the reason I ask that is because years ago, me and a lawyer, we are striking the jury and qualifying the jury and all that, and we get 12 jurors in the jury box. And we are walking up to the Judge's bench and one of them reaches out and grabs us by the sleeve and says, `You shouldn't have put me on the jury.' And I said, `Why not?' `Cause I can't vote any way. My religion tells me I can't do that.' So, we had to go to the Judge and undo what we had done. So, let us know, now, if it's a problem on your mind. Let us know privately before we put you in something that you can't be in."
(R. 12-13.)
C.J. responded, engaging in the following exchange with the prosecutor:
"[C.J.]: Could I say something, sir?
"[Prosecutor]: Yes, sir.
 "[C.J.]: You said religion, but could it be somebody that you liked real good and, then, they had you on the jury, would you have to?
"[Prosecutor]: Could you tell us about that? *Page 84 
"[C.J.]: I don't believe I could stand it."
(R. 13-14.)
Later, during individual voir dire, the trial court questioned C.J.:
 "The Court: . . . [Y]ou made a response, I believe, to one of [the prosecutor's] questions that it's possible that you couldn't be fair. And we just want to ask you about that. What did you mean by that?
 "[C.J.]: What I meant, if somebody, you know, was out there and I liked them real well that, you know, if I didn't know nothing about what he had did, I wouldn't want to be, you know —
 "The Court: I see. Do you know anybody in this trial? Do you know the defendant, Mr. Hall?
"[C.J.]: I ain't never seen him before as I knows of.
"The Court: So, you could be fair since you don't know him.
"[C.J.]: Since I don't know nothing about him."
(R. 29-30.) After this exchange between the court and C.J., the prosecutor asked C.J. no additional questions.
The prosecutor's stated reasons for striking C.J. were that he had given an "ambiguous and confusing" response to the prosecutor's question asking prospective jurors whether they had any moral, religious, or ethical beliefs (or "plain old gut feeling") that would keep them from sitting on a jury and rendering a verdict, and that C.J.'s response to his question "actually [had] nothing to do with the question." The prosecutor explained that C.J.'s apparent inability to understand his question caused him concern that C.J. might not understand the jury charges the trial court would give in the case. A prospective juror's apparent inability to understand questions posed during voir dire examination is a race-neutral reason for striking that juror. E.g.,Vanderslice v. State, 671 So.2d 769, 770 (Ala.Cr.App. 1995); McGlown v.State, 598 So.2d 1027, 1029-30 (Ala.Cr.App. 1992).
On appeal, Hall argues that the prosecutor's explanation for striking C.J., although facially race neutral, was pretextual, and that the real motive for removing C.J. was race. Hall says that the ambiguity and confusion was not, as the prosecutor maintained, in C.J.'s responses during voir dire examination, but rather in the "rambling" question the prosecutor put to the venire concerning whether anyone held moral beliefs that would keep them from sitting on a jury. (Hall did not make this argument in the trial court.) We concede that there is some open-endedness in the prosecutor's question, and we cannot say that C.J.'s answer was a non sequitur. However, the general import of the prosecutor's question was directed to prospective jurors' moral and ethical convictions, and reservations about sitting in judgment of others (although there was also an appeal to their "gut feeling"), while C.J.'s response concerned mainly whether he could sit on a jury when the defendant was someone he "liked real well" (he could not, he said), as opposed to someone he knew nothing about (he could sit on this person's jury and be fair). Thus, the record lends some credibility to the prosecutor's assertion that C.J.'s answer was nonresponsive to the question, and supports the prosecutor's conclusion that C.J. was unable to understand the question. We do not find the prosecutor's question to be as confounding as Hall claims it was.
The trial court chose to believe the prosecutor's race-neutral explanation for striking C.J., and we do not see on what basis we can overturn its ruling, which is based in large part on credibility. SeeBatson, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21 (the trial court's finding on the issue of *Page 85 
discriminatory intent in the use of peremptory challenges will "largely turn on evaluation of credibility").
The prosecutor gave the following explanation for striking R.J., a black male:
 "[R.J.] had no response at all to voir dire questions. However, our records indicated that he has been charged with or convicted of assault in the third degree and, also, criminal mischief, and I struck him for those reasons."
(R. 47.)
Striking a prospective juror who has been prosecuted for a crime has been held to be a race-neutral reason. E.g., Bennett v. State,659 So.2d 176, 177 (Ala.Cr.App. 1994); Butler v. State, 646 So.2d 689,690 (Ala.Cr.App. 1993). On appeal, Hall says that there is nothing in the record, other than the prosecutor's assertion, to prove that R.J. had a criminal record. He points out that R.J. did not respond during voir dire when the prosecutor asked prospective jurors if any of them, or their family members, had been charged with, or convicted of, a crime. He argues that R.J.'s silence on this issue obligated the prosecutor to then call R.J. to the bench for a private inquiry into the accuracy of the State's information that R.J. had a criminal record. However, Hall did not raise this argument in the trial court: he did not challenge the accuracy of the State's information or question the prosecutor's credibility, and he did not demand that the State substantiate R.J.'s criminal record. There is no requirement that a prosecutor establish evidentiary support for every strike in every case, especially where the defendant has not specifically questioned the validity of the prosecutor's explanations or demanded further proof. See David v. State,740 So.2d 1142 (Ala.Cr.App. 1998) (Long, P.J., concurring in result), citing Reese v. City of Dothan, 642 So.2d 511, 514 (Ala.Cr.App. 1993) (where, although the prosecutor did not present documentation to substantiate his explanation that he struck black veniremembers because of their arrest records, it was not error to deny the defendant's Batson
motion, because the defendant did not argue in the trial court that the prosecutor engaged in disparate treatment by failing to strike white veniremembers who had arrest records). We will not overturn the trial court's judgment as to the credibility of the prosecutor's explanation for striking R.J.
The prosecutor gave the following explanation for striking J.M., a black male:
 "The reason [J.M.] was struck was because of a federal conviction that he admitted to privately before the Court in voir dire. And, also, he appeared nervous when he was in court today. I don't know why. I know everyone is a little nervous, but I don't know why he appeared as nervous as he was today. Secondly, he mentioned in voir dire that he had sat on a jury previously on a Hawkins jury where I had assisted Mr. Valeska. And I've never assisted Mr. Valeska in the Hawkins trial. I had tried Mr. Hawkins myself, but I never assisted him. You know, that is not that big of a deal, but it's just one small factor I considered in addition to the fact that he had the federal conviction that he admitted to, and he was struck for those reasons."
(R. 47-48.)
Hall's trial counsel acknowledged that J.M. appeared nervous during the voir dire examination. Nervousness is a facially race-neutral reason for striking a juror, see Hart, supra, 612 So.2d at 524 (demeanor of juror may form the basis for a valid race-neutral strike); moreover, J.M.'s criminal conviction was, by itself, a sufficient race-neutral reason for the state to *Page 86 
remove him from the jury with one of its peremptory challenges. E.g.,Bennett, 659 So.2d at 177; and Butler, 646 So.2d at 690. During voir dire, J.M. stated that he had been convicted of a felony in 1971; the conviction, he said, was later "annulled," and, according to J.M, "I received my civil and political rights in 1985, I believe it was." (R. 38.) J.M. also said that, "four or five years" before Hall's trial, he had sat on jury in a case where the prosecutor who was trying Hall had assisted another prosecutor. (Hall's prosecutor disputed the accuracy of this recollection; he maintained that he had tried that case alone.)
Hall does not question the existence of J.M.'s prior conviction; however, he argues that the fact that J.M. previously served on a jury in a criminal case tried by the same prosecutor (where, apparently, a guilty verdict was returned) was proof that, despite his own criminal conviction, J.M. had no bias against the State and also proof that the prosecutor in Hall's case, when trying the earlier case where J.M. had served on the jury, must not have attached much weight to J.M's criminal record, or else he would have struck J.M. in that earlier case. Thus, says Hall, we should conclude that the prosecutor's explanation for striking J.M. was pretextual, and that it papered over a racial motive. This is too much conjecture.
Furthermore, the prosecutor struck two white jurors who stated during voir dire examination that they had family members who had been charged with, or convicted of, crimes. This comparable treatment of similarly situated jurors of both races tends to rebut any inference of discriminatory intent in the prosecutor's strikes against black jurors.Ex parte Brooks, 695 So.2d 184, 191 (Ala.), cert. denied, 522 U.S. 893,118 S.Ct. 233, 139 L.Ed.2d 164 (1997); see Carrington v. State,608 So.2d 447, 449 (Ala.Cr.App. 1992). There is no basis on which to overturn the trial court's judgment of the credibility of the prosecutor's explanation for striking J.M.
The prosecutor gave the following explanation for his peremptory challenge against B.E., a black female:
 "[B.E.] . . . stated in voir dire that she had a relative convicted of a crime, specifically second-degree rape. I struck her for that reason. She didn't concern me that greatly [because] of that fact, but that was something that I thought was negative as far as I'm concerned and was a reason for me to consider striking her, so I did strike her.
 "And I would point out, your Honor, that I, also, struck two jurors who were white and who had almost identical responses. For example, number 115, [F.P.], stated that her son had been convicted for selling marijuana 10 years ago, but she could be fair and not hold that against the State. Nevertheless, I struck [F.P.], the white juror.
 "And, also, your Honor, the State struck [P.M.], number 91. She was also a white juror. She stated that her son had been charged with robbery some time ago, but she would not hold that against the State. She, again, is a white juror, and she was struck because of a relative who had been prosecuted or charged."
(R. 48-49.)
Striking a prospective juror who has a family member with a past criminal history has been held to be a race-neutral reason. Bennett, supra, 659 So.2d at 177. The prosecutor struck two white jurors for the same reason he struck B.E. See Ex parte Brooks, 695 So.2d at 191;Carrington, 608 So.2d at 449. There is no basis for overturning the trial court's ruling, *Page 87 
which was based on the credibility of the prosecutor's explanation for striking B.E.
The prosecutor gave the following explanation for striking T.P., a black female:
 "The last strike of a black juror was my overall last strike; that was my 10th strike overall, number 111. She is, now, the alternate on this jury. That is [T.P.], and, your Honor, she was struck because the information sheet indicates that she was 27 years old. She is not working; unemployed and single. And being unemployed isn't necessarily a reason to strike someone, but the law says we can consider employment status of individuals. Being single, alone, isn't a reason necessarily that would cause me to strike someone. But when you combine the two, single and unemployed, then, you combine the juror's age, which is, now, 27, and I could conclude from that, that this juror is simply sitting around not doing anything, not working, not going to school, no ambition, no interests, no occupation, no interest in having an occupation.
 "That may or may not be true. But I'm not required to take a risk of putting a juror like that on the jury, and just seeing how it comes out. And I would point out, again, Judge, that there are no white jurors who are single and unemployed who are sitting on this particular jury. Every juror here is either employed or they are married to my knowledge or they indicated that they were retired, unlike this juror who simply noted on her information form that she was not working, not disabled, not retired, simply not working. And I would point out specifically, Judge, with respect to Juror number 96, who was a white juror that I struck. I struck him because he was — one of the factors that I considered was that he was retired and not working and that he was single. So, those factors that I used to strike [T.P.] were, also, considered in striking the white juror, number 96."
(R. 49-50.)
The prosecutor's stated reasons for striking T.P., when taken together, were valid reasons for the peremptory challenge. See Ex parteBrooks, 695 So.2d at 190. Apparently, the prosecutor believed, rightly or wrongly, that in some cases unemployment is an indicator of apathy, which includes indifference to matters of the community (e.g., one's duties as a juror).[1] Obviously, such an assumption is not always warranted, and might itself be the result of certain unworthy prejudices on the part of the person making the assumption. However, we do not find it altogether unreasonable for the prosecutor to prefer stable jurors over unstable jurors. Furthermore, the prosecutor's comparable treatment of jurors of both races in this regard tends to rebut any inference of racially discriminatory intent in the prosecutor's strike against T.P. Exparte Brooks, 695 So.2d at 191. See also, e.g., Macon v. State,659 So.2d 221, 223 (Ala.Cr.App. 1994) ("The fact that a veniremember is unemployed may constitute a valid race-neutral reason for the exercise of a peremptory strike if used to remove both black and white veniremembers.").
Here, the prosecutor offered race-neutral explanations for the five peremptory challenges used against black prospective jurors. The trial court found those explanations to be plausible. The trial court's ruling in this regard will be overturned only if it is "clearly erroneous." *Page 88 
Ex parte Branch, 526 So.2d 609, 625 (Ala. 1987). We cannot say that the trial court's ruling denying Hall's Batson motion was clearly erroneous.
For the reasons stated, the trial court's judgment is affirmed.
AFFIRMED.
McMillan, Cobb, Baschab, and Fry, JJ., concur.
[1] The prosecutor was careful to state that he did not know this to be the case with T.P. However, he maintained that he should not be "required to take a risk of putting a juror like that on the jury, and just seeing how it comes out."