820 So.2d 113 (1999)
Steven Wayne HALL, Jr.
v.
STATE.
CR-94-0661
Court of Criminal Appeals of Alabama.
October 1, 1999.
Rehearing Denied November 12, 1999.
*120 Paul D. Brown, Mobile; and William Robert McMillan, Monroeville, for appellant.
Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for appellee.
PER CURIAM.
The appellant, Steven Wayne Hall, Jr., was indicted by a Conecuh County grand jury for murder made capital because the murder was committed during the course of a burglary. See § 13A-5-40(a)(4), Ala. Code 1975. After Hall's codefendant, Wayne Holleman Travis,[1] was tried and convicted of capital murder in Conecuh County, Hall moved for a change of venue based on what he says was the excessive publicity surrounding Travis's trial. The motion was granted and Hall's case was transferred to Monroe County. Hall was tried and convicted by a Monroe County jury for the offense charged in the indictment. The jury, by a vote of 10-2, recommended that Hall be sentenced to death. The trial court accepted the jury's recommendation and sentenced Hall to death by electrocution.
The State's evidence tended to show that on December 15, 1991, Conecuh County sheriff deputies discovered the body of 69-year-old Clarene Haskew on the kitchen floor of her home in McKenzie. Haskew had been shot twice in the back of the head, severely beaten, and strangled. A neighbor telephoned Haskew's son after she went to Haskew's home and discovered that the telephone line had been cut and that the glass on the entry door had been broken. Dr. Gregory Price Wanger, a forensic pathologist employed by the Alabama Department of Forensic Sciences, testified that Haskew was alive when she was shot and when the blunt force injuries were inflicted; thus, it was impossible for *121 him to conclude which injuries occurred first.
When her body was discovered, Haskew's home was in total disarray and a pentagram had been spray-painted on the kitchen cabinets. The words "Thunder Struck" were also spray-painted on the kitchen floor near Haskew's body. Silverware and an address book had been taken from the scene and Haskew's gray 1982 Ford LTD automobile was missing. A be-on-the-lookout ("BOLO") was issued for the car.
On the day of the murder, Nellie Schad's home, which was about one-fourth mile from Haskew's home, was burglarized. A.38 caliber Rossi revolver and a .410 gauge shotgun were taken in the burglary. Forensic analysis matched one bullet removed from Haskew's body with the .38 caliber gun stolen from Schad's home on the day of the murder.
As a result of the BOLO, police received information that the stolen automobile was parked outside Paula Shiver's house in Uriah. Paula Shiver was Hall's girlfriend. When deputies arrived at Shiver's residence they saw a Ford automobile matching the description of Haskew's stolen vehicle in Shiver's yard. One of the deputies approached the vehicle to verify from the license plate that the vehicle was Haskew's vehicle. After they verified that it was Haskew's car, the deputies knocked on Shiver's door. Paula Shiver answered the door and told the deputies that Hall and Travis were in the house. While Shiver talked with the deputies Hall and Travis fled on foot.
The dog warden from Fountain Prison was called to assist in apprehending Hall and Travis. Dogs tracked the two to the Rocky Hill community. When they found Hall and Travis, deputies attempted to get them to surrender. After deputies fired gunshots into the air, both suspects used profanity; one of the two suspects yelled, "if it's going to be a shoot out, a shoot out it will be." Deputies then shot in the direction of the suspects, wounding both Hall and Travis. Hall was shot in the upper thigh. While waiting for an ambulance, deputies searched Hall and recovered seven rounds of .38 caliber ammunition in Hall's front vest pockets. These bullets fit one of the guns stolen from Schad's housethe gun that was identified as the murder weapon. The deputies search of Travis revealed that Travis had the keys to the stolen Ford in his possession. Also, numerous items stolen from Haskew's and Schad's houses were discovered in the Ford. The murder weapon was discovered in the Ford.
Hall conceded at trial and at oral argument before this Court that he participated in the burglary of Haskew's house. His defense was that he did not know that Travis intended to kill Haskew.

Standard of Review
Hall has been sentenced to death. As is the case with every death penalty case, this court is obliged, pursuant to Rule 45A, Ala.R.App.P., to review the transcript of the proceedings for plain error, whether or not the issue was raised before the trial court or on appeal. Plain error is defined as error that has "adversely affected the substantial right of the appellant." The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is "particularly egregious" and if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." See Ex parte Price, 725 So.2d 1063 (Ala.1998), *122 cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).
Many of the issues Hall raises on appeal were not first brought to the trial court's attention; thus, this court's review of these matters is limited to application of the plain-error doctrine.

Guilt Phase Issues

I.
Hall argues that the trial court erred in not granting his second motion for a change of venue. The record reflects that on March 18, 1993, the trial court granted Hall's motion for a change of venue and transferred the case to Monroe County. The trial court noted that Hall's codefendant, Wayne Travis, had been tried and convicted of capital murder immediately before he granted the motion for a change of venue and that Travis's trial had received widespread publicity. Hall's trial was scheduled to begin on August 9, 1993, in Monroe County.
On August 5, Hall filed a second motion for a change of venue, attaching an article that had appeared in the Monroe Journal on August 4, 1993. The article summarizes the facts surrounding Haskew's murder, indicates that Travis had been tried and convicted of capital murder for Haskew's death, and reports that Hall was on probation for three counts of burglary when Haskew was murdered. The newspaper on August 4, 1993, also contained a list of jurors who had been called for jury service, beginning on August 9.[2] After hearing argument on the motion, the trial court took the motion under advisement pending the outcome of voir dire examination of the prospective jurors. After voir dire examination Hall did not renew his motion for a change of venue.[3]
As this Court has previously stated concerning a motion for a change of venue:
"`"A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court *123 has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App. 1983)."
"`Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).'
"Clemons v. State, 720 So.2d 961, 977 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999). `The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson [, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.' Slagle v. State, 606 So.2d 193, 195 (Ala.Cr.App. 1992). "`Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.'" Whisenhant v. State, 555 So.2d 219, 224 (Ala.Cr.App. 1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990) (citations omitted) (quoting Dannelly v. State, 47 Ala.App. 363, 254 So.2d 434, cert. denied, 287 Ala. 729, 254 So.2d 443 (1971)).
"`In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated "actual prejudice" against him on the part of the jurors; 2) when there is "presumed prejudice" resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir.1983).'

"Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994)."
Samra v. State, 771 So.2d 1108, 1113 (Ala. Cr.App.1999).
Here, there was extensive publicity surrounding the case when Hall and Travis were initially captured and charged with the murder of Haskew. The murder occurred in December 1991. As a result of the publicity surrounding their capture and the publicity surrounding Travis's trial in March 1993, Hall's case was moved to Monroe County; it was set for trial in August 1993. In support of the motion for a second change of venue, Hall attached only one article. That article had appeared in the Monroe Journal several days before Hall's trial was scheduled to begin. As the trial court correctly noted, the correct way to determine if the pretrial publicity had saturated the community was through voir dire examination of the prospective jurors. That is one reason for the extensive voir dire examination in this case.
The thorough and sifting voir dire examination of the prospective jurors was conducted in panels of six and composes approximately 10 volumes of the 48-volume record on appeal. It is clear from a review of the voir dire that the trial court went to great lengths to ensure that Hall had a impartial venire from which to draw his jury. A total of 88 prospective jurors were questioned on voir dire. Of the 88 jurors, approximately 28% of the venire, or 25 jurors, indicated that they had seen or had read the article in the Monroe Journal. The majority of those jurors that had seen the article were struck for cause. The remaining jurors indicated that anything they had seen or had read about the case would not affect their ability to be impartial *124 and that they could base their decision on the evidence presented at trial. There was absolutely nothing that suggested that the article "saturated" the community with prejudicial publicity; thus, Hall has failed to show that there was presumed prejudice.
Neither has Hall proven that there was actual prejudice. Hall has not argued, and indeed the record would not support such an argument, that any of the jurors who were not struck for cause were not impartial. There has been no showing of actual prejudice. We find no greater support for this conclusion than the fact that after voir dire examination was completed Hall did not renew his motion for a change of venue.
The trial court committed no error in denying Hall's second motion for a change of venue.

II.
Hall next argues that the trial court erred in the voir dire examination by attempting to rehabilitate jurors who had stated that they would automatically vote to impose the death penalty if Hall was found guilty of capital murder.
This Court can find no place in the voir dire where Hall challenged the way in which the trial court conducted voir dire examination. Therefore, our review of this issue is limited to review under the plainerror doctrine. Rule 45A, Ala.R.App.P.
As stated above, the voir dire examination was extensive. The trial court questioned all of the jurors as a whole by asking the group if any of the members had a fixed opinion for or against capital punishment and whether they could follow the law as it related to aggravating and mitigating circumstances. After the whole venire was split into groups of six, the first several groups were subjected to more extensive questioning. The record reflects that the first several panels were confused about capital cases and the questions the trial court had initially asked them. The majority of the jurors challenged were from the first several panels. Hall argues that the trial court erred in attempting to rehabilitate those jurors who had indicated that they would automatically vote to impose the death penalty.
Initially, we note that the conduct of voir dire examination is discretionary with the trial court.
"In selecting a jury for a particular case, `the nature, variety, and extent of the questions that should be asked prospective jurors' must be left largely within the sound discretion of the trial court. Peoples v. State, 375 So.2d 561 (Ala.Crim.App.1979). In other words, the scope of the voir dire examination of the jury venire is within the broad discretion of the trial court. Bowens v. State, 54 Ala.App. 491, 309 So.2d 844 (1974), cert. denied, 293 Ala. 746, 309 So.2d 850 (1975); Witherspoon v. State, 356 So.2d 743 (Ala.Crim.App.1978); Ervin v. State, 399 So.2d 894 (Ala.Crim. App.), cert. denied, 399 So.2d 899 (Ala. 1981). It is highly proper for the trial court to conduct the voir dire examination. Witherspoon v. State, supra, and cases cited therein."
Bracewell v. State, 447 So.2d 815, 821 (Ala. Cr.App.1983), aff'd, 447 So.2d 827 (Ala. 1984), cert. denied, 469 U.S. 980, 105 S.Ct. 382, 83 L.Ed.2d 318 (1984).
In Hubbard v. State, 231 So.2d 86, 285 Ala. 212 (Ala.1970), death sentence vacated, 408 U.S. 936, 92 S.Ct. 2859, 33 L.Ed.2d 752, on remand, 290 Ala. 120, 274 So.2d 301 (Ala.1973), a capital case where the trial court excused four prospective jurors because they did not believe in capital punishment, the Alabama Supreme Court concluded that the trial court's "probing" into reservations of the prospective jurors *125 was proper. The Alabama Supreme Court stated:
"In the present case, the court's interrogation and probing into the reservations of conscience of the prospective jurors was of an exacting nature. Its purpose was to determine if their opposition to capital punishment would prevent them from being impartial jurors and from imposing the death penalty, when law and good conscience might deem it appropriate. If such animus existed in any juror, he would have a fixed opinion, which means an absolute and settled mind against capital punishment that was not subject to change, thereby preventing him from being impartial.
". . . .
"Here the matter transcends the issue of disqualifying jurors for cause who express qualms and conscientious scruples against capital punishment. It involves forcing the state to select a jury from a venire composed of some, whose personal beliefs, and their adherence thereto, would so deprive them of the ability to exercise discretionary judgment, when it became a matter of inflicting the death penalty, that they either would not or could not obey their oath, which is to well and truly try all issues and a true verdict render according to the evidence."
Hubbard, 231 So.2d at 87-88. The view espoused in Hubbard has been incorporated into our Rules of Criminal Procedure. Rule 18.4, Ala.R.Crim.P., states, in part:
"(c) Voir Dire Examination. The court shall permit the parties or their attorneys to conduct a reasonable examination of prospective jurors. The court also may conduct an examination of prospective jurors, and the court, in its discretion, may direct that the examination of one or more prospective jurors be separate and apart from the other prospective jurors.
"(d) Scope of Examination. Voir dire examination of prospective jurors shall be limited to inquiries directed to basis for challenge for cause or for obtaining information enabling the parties to knowledgeably exercise their strikes."
The Florida Supreme Court has stated that it is the duty of the prosecutor and the judge to rehabilitate a juror who has made responses during voir dire examination that would support a challenge for cause. In Bryant v. State, 601 So.2d 529, 532 (Fla.1992), the Florida Supreme Court stated:
"The standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment was restated by the United States Supreme Court in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), in which that Court stated:
"`That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with Witherspoon's [v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) ] reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity."`
"Id. at 424, 105 S.Ct. at 852 (footnote omitted) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)).
".... We hold that it is not defense counsel's obligation to rehabilitate a juror who has responded to questions in a manner that would sustain a challenge for cause. The appropriate procedure, *126 when the record preliminarily establishes that a juror's views could prevent or substantially impair his or her duties, is for either the prosecutor or the judge to make sure the prospective juror can be an impartial member of the jury."
Although, we decline to adopt the holding of the Florida Supreme Court, we cite the case for the proposition that having the trial court rehabilitate jurors is a practice favored by reviewing courts. We hold that the trial court's questioning of the prospective jurors in this case was not error, much less plain error.

III.
Hall next argues that the trial court erred in denying several of his challenges for cause. Specifically, he contends that the trial court erred to reversal in denying his challenges for cause of eight prospective jurors who, he alleges, indicated biases during voir dire examination. In his brief to this Court, Hall addresses only the failure to strike prospective juror E.M. because, he alleges, she stated that, upon a conviction for a capital murder, she would always vote for the death penalty.
A review of the voir dire examination shows that this juror was confused about the judicial process in a capital case. Initially, she stated that she would vote for the death penalty. However, when the court explained the concept of aggravating and the mitigating circumstances and the need to weigh them against one another, E.M. indicated that she was confused. In an attempt to clarify E.M.'s confusion, the trial court gave a detailed explanation of the law as it relates to aggravating and mitigating evidence and the weighing process that a jury in Alabama uses to determine a sentence in a capital case. After this explanation the following occurred:
"The Court: Now would you automatically impose the death penalty or would you wait and weigh it?
"[E.M.]: I would weigh
"The Court: Now either way is fine. You have a right to your opinion. If you feel like you would automatically impose the death penalty, that's perfectly okay to say yes.
"[E.M.]: I think I'd wait and hear both sidesI'd do that.
"The Court: Now this wouldn't have anything to do with whether or not he was guilty because you had already decided that at that point. You'd already be absolutely certain he was guilty, beyond a reasonable doubt, and to a moral certainty and you'd have already heard how bad the murder was so you'd know how bad it was at that point, could you still then weigh those aggravating and mitigating circumstances or would you want to just go ahead and automatically sentence the Defendant to death?
"[E.M.]: I think I'd want to wait and hear thethe circumstances.
". . . .
"[E. M.]: Like I say, I'd like to hearI don't know anything about what happened. I don't know anything about that. I think I'd have to sit there as a jury to hear what they say before I really say that he would have to spend life without parole or either get the death penalty."
As this Court stated in Travis v. State, 776 So.2d 819, 867 (Ala.Cr.App. 1997):
"`Even though a prospective juror may initially admit to a potential for bias, the trial court's denial of a motion to strike that person for cause will not be considered error by an appellate court if, upon further questioning, it is ultimately determined *127 that the person can set aside his or her opinions and try the case fairly and impartially, based on the evidence and the law. Knop v. McCain, 561 So.2d 229 (Ala.1989); Siebert v. State, 562 So.2d 586 (Ala.Cr.App.1989), affirmed, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Perryman v. State, 558 So.2d 972 (Ala.Cr.App. 1989). Only when a prospective juror's testimony indicates a bias or prejudice so fixed or deep-seated that that person cannot be impartial and objective must a challenge for cause be granted by the trial court. Knop, supra; Siebert, supra; Perryman, supra.'

"Ex parte Land, 678 So.2d 224, 240 (Ala. 1996), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). See also Harrell v. State, 470 So.2d 1303 (Ala.Cr.App.1984)."
E.M. indicated that she could follow the law. The trial court committed no error in failing to grant Hall's challenge of E.M. for cause.
As to the seven other prospective jurors who Hall argues on direct appeal should have been struck for cause, the only argument in his brief concerning those prospective jurors is the following:
"In addition, to [E.M.], numerous other veniremembers stated that they could not follow the law because they would automatically vote in favor of the death penalty, or because they could not consider mitigating circumstances. These veniremembers included: (1) [L.R.], who stated that he would always impose the death penalty for intentional murder regardless of the evidence (R. 5512); (2) [A.C.], who stated that she would always impose the death penalty for intentional murder regardless of the evidence (R.5512); (3) [D.S.], who stated that he would always impose the death penalty and that he would do so for the killing of the elderly (R. 5512, 5546); (4) [K.W.], who stated that she could not consider statutory mitigating circumstances and that she would always vote for the death penalty if the victim was elderly (R. 6769, 6828, 6831, 6833, 6836-37); (5) [D.H.], who stated that she could not consider statutory mitigating circumstances, that Mr. Hall would have to take the stand and prove he was innocent and that she would impose the death penalty automatically for the killing of the elderly (R. 6768, 6795, 6801, 6828-36); (6) [N.B.], who knew a great deal about the case and said he would always vote for the death penalty for the murder of an elderly person (R. 6923, 6932-35); and (7) [B.N.], who stated that he would find Mr. Hall guilty if he did not testify and that he believes life imprisonment without parole is `a joke.' (R. 7081, 7093)."
We have examined the extensive voir dire of the prospective jurors indicated above. The trial court was patient with the prospective jurors and made every attempt to ensure that each juror understood the questions before he or she gave an answer. The trial court showed its willingness to grant Hall's challenges for cause by granting many of his challenges. Each of the challenged jurors unequivocally stated that he or she could follow the law as stated by the judge and could evaluate the case on the evidence presented at trial. One prospective juror even stated that if he could not follow the law he should not be on the jury. No error occurred here.

IV.
Hall next argues that the trial court erred in denying his Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 *128 (1986), motion because the State used 9 of its 14 peremptory strikes to remove blacks from the venire.
Initially, we note that Hall's only basis for the Batson objection was that the State struck 9 out of 14 blacks from the venire. This Court recently in Young v. State, 730 So.2d 1251, 1253 (Ala.Cr.App. 1998), stated:
"Young's only ground for his Batson motion was that the prosecutor had used 7 of her 15 strikes to remove blacks from the venire. `Without more, we do not find that the number of strikes this prosecutor used to remove [blacks] from the venire is sufficient to establish a prima facie case of racial discrimination.' Ex parte Trawick, 698 So.2d 162 (Ala. 1997)."
Here, the trial court could have lawfully found that no prima facie case of discrimination had been proven if Hall made no further argument on his Batson objection. However, because the trial court found that Hall had made a prima facie case of discrimination and allowed the State to provide its reasons for striking the black prospective jurors, we will evaluate those reasons to determine if there was a Batson violation. See Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Williams v. State, 620 So.2d 82 (Ala.Cr.App.1992).
The prosecutor gave the following reasons for striking the black prospective jurors:
Juror M.C."M.C. in her questionnaire and in her questioning by me as a juror, stated that her choice in every single case would be life without parole. She did not indicate a willingness toto follow the death penalty. And she just wasexpressed reluctance throughout and even, finally, when pinned down, said that she just would take life without parole in every single case."
Juror R.S."R.S. stated, in direct questioning by the State, that she had strong reservations about the death penalty. She said that it would take a whole lot for her to vote for the death penalty. In the questionnaire that she filled out, she did not answer the question, direct question in the questionnaire about the death penalty, for what purpose does the death penalty serve. She wouldn't answer the question about what impression life without parole would have. She stated that she had extreme and strong reservations. And it was felt by us, for nonracial reasons, that she could not follow the law of Alabama and vote for the death penalty if the evidence so proved in this case."
Juror J.M."J.M. was in one of the earlier panels that came in. She stated that she had real problems and reservations regarding the death penalty. And in answer to the question, what type of cases or offenses do you feel the death penalty should be imposed, she said, `I oppose this type of punishment.' In questioning by me, in regard to that issue, she said she would try to be open-minded, but, that she just didn't feel like she could go for the death penalty and thatthat this would not bring back the killershe said, `If you kill the [defendant], you're just as bad as the killer.'"
Juror D.W."D.W. stated, in his questionnaire, some reservations about the death penalty. For instance, he said that he didn't like the taking of a human life. And hehe had strong reservations, in direct questioning by the State, about the death penalty. He stated it wouldin our opinion, a great reluctance to go along with the death penalty."

*129 Juror M.L."M.L. was in one of the first panels that we brought in here. She, in questioning, direct questioning, had strong reservations about the death penalty. Said she'd never given it much thought. She said that she would have great reservation in doing that. She said that her choice would be life without parole, generally. And we struck her for that reason. We made notes of all these questionnaires, my associates did, during the questioning, by the way, Your Honor. And our notes indicated that M.L. had a strong resistance to the death penalty."
Juror R.L.[4]"R.L. was one of the first jurors that we had in the panel. He stood up, in questioning, when we started the questioning, when the Court did the general questioning to start with and asked to be excused. He said he had heart trouble. He didn't want to serve on the jury. He expressed confusion when he came in the courtroom. He did state very strong opinions about the death penalty, but, we struck R.L. because ofof his initial unwillingness to want to serve and because of his age and general health condition, Judge. Primarily his health condition and his demeanor when we asked him the questions."
The reason given for a peremptory strike need not rise to the level of a challenge for cause to satisfy Batson. See Dallas v. State, 711 So.2d 1101 (Ala.Cr. App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).
Facially, the strikes in this case of the prospective jurors who had expressed reservations about the death penalty were sufficient to not violate Batson. Mixed feeling or reservations about the death penalty are valid reasons for peremptory strikes that do not violate Batson. Smith v. State, 531 So.2d 1245 (Ala. Cr.App.1987); Levert v. State, 512 So.2d 790 (Ala.Cr.App.1987). Also, striking a juror who has indicated his desire not to serve is a reason that does not violate Batson. Lewis v. State, 659 So.2d 183 (Ala.Cr.App.1994); Stephens v. State, 580 So.2d 11 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991).
On direct appeal Hall challenges the reasons given for striking all of the above-listed jurors. However, at trial Hall questioned only the prosecutor's reason for striking juror M.L. He argued that the reason giventhat M.L. had reservations about imposing the death penaltywas erroneous because this juror had indicated on her juror questionnaire that she was in favor of the death penalty. A review of M.L.'s juror questionnaire indicates that M.L. marked that she strongly agreed with the statement, "Any person who intentionally kills another should get the death penalty." However, during voir dire questioning by the prosecutor the following took place:

*130 "Q [prosecutor]: I see that you said you have mixed feelings about the death penalty as well, is that right?
"[M.L.]: Yes, sir.
"Q: What is that based on, please, ma'am?
"[M.L.]: Well, if you convince me on the evidence
"Q: Would you base your decision on the evidence?
"[M.L.]: Yes, sir.
"Q: Are there cases in which you could vote for the death penalty under certain kinds of facts, certain kinds of cases?
"[M.L.]: Well, I think the death penalty, to me, I couldn't really say, but, if it be a threat to the public."
This exchange indicated that M.L. had mixed feelings about the death penalty. The record supports the strike of this juror based on the reason advanced by the prosecutor. Although having mixed feelings about the death penalty is not a sufficient reason to strike a juror for cause, the reason does not violate Batson. Levert, supra.
The reasons advanced for striking the remaining above-listed jurors were not questioned at trial. We have stated, "There is no requirement that a prosecutor establish evidentiary support for every strike in every case, especially where the defendant has not specifically questioned the validity of the prosecutor's explanations or demanded further proof." Kevin Brett Hall v. State, 816 So.2d 80, 85 (Ala. Cr.App.1999).
Because this is a death-penalty case, we will address Hall's argument on appeal. The following occurred during the voir dire examination of M.C.:
"[M.C.]: Okay. I don't know what questions this would answer, but, I'm against the death penalty.
"The Court: All right. You're basically against the death penalty? Would you refuse to impose it regardless of what kind of case it was?
"[M.C.]: I just don't agree with killing, I mean, the death penalty. Everybody should be punished some kind of way, but, I don't go with taking another life."
M.C. clearly indicated her opposition to the death penalty and was struck for this reason.
During the voir dire questioning of R.S. the following occurred:
"Mr. Chapman [prosecutor]: You don't think youyou don't like the death penalty, is that right?
"[R.S.]: No.
"Mr. Chapman: You have some very strong reservations about it, is that right?
"[R.S.]: Right.
"Mr. Chapman: So, what you're saying it would takecould you ever vote for the death penalty, you think?
"[R.S.]: I don't think so."
The record supports that this juror was struck because of her strong reservations against the death penalty.
During the voir dire questioning of juror J.M. the following occurred:
"Mr. Chapman [prosecutor]: I notice on here in response to questions about the death penalty that you said that you oppose this type of punishment.
"[J.M.]: (Nodding head affirmatively.)
"Mr. Chapman: Could you explain to me your feelings about that?
"[J.M.]: To the deathpenalty?
"Mr. Chapman: Yes, ma'am.
"[J.M.]: That's the electric chair?
"Mr. Chapman: Uh-huh.
"[J.M.]: Well, I feel that a person really wouldn't be, you know, he kill a person, *131 they just out of their misery. But, if they're put on row deathI mean on
"Mr. Chapman: In prison?
"[J.M.]: In prison, all, they are punished more. Now that's my opinion about it.
"Mr. Chapman: All right. The judge just asked you a question about whether or not you would be opposed to the death penalty where you would not vote for it in any case. Are you saying there are cases you would vote for the death penalty?
"[J.M.]: I have a very open mind, I have to thinkBut, I do oppose it, Your Honor.
"Mr. Chapman: Well, let me ask you this question: Is your opposition based on youron religious conviction or just a personal feeling oror what?
"[J.M.]: Well, the Bible says thou shall not kill.
"Mr. Chapman: All right. So it's based on a religious conviction, is that right?
"[J.M.]: Uh-Huh."
The record reflects that J.M. opposed the death penalty and was struck based on her opposition to the death penalty.
When D.W. was questioned by the prosecutor during voir dire he stated the following:
"Mr. Chapman [prosecutor]: All right. So, I ask you this question, if you found a person guilty of capital murder, would you be able to go through this weighing process, say have mercy on this person?
"[D.W.]: Not give him the death penalty as far as the taking of someone's life, maybe life imprisonment.
"Mr. Chapman: You said in here you believe life imprisonment would be appropriate punishment, have you not? You believe that would be an appropriate punishment under certain conditions, isn't that true?
"[D.W.]: Right.
"Mr. Chapman: So, you wouldn't vote for the death penalty all the time, would you?
"[D.W.]: No."
The strike of this prospective juror was based on his reservations about the death penalty.
The reason advanced for striking R.L. was that this juror indicated that he did not want to serve because of his poor health. During the general qualifying of the jury the following occurred:
"The Court: ... All right. Ladies and gentlemen, now this is your last opportunity to ask theseanswer this kind of question, so, you better ask if you want to be excused at this point. Don't come up later on and say, Judge, I meant to say such and such because it's going to be too late. What's your name, sir?
"A juror: R.L.
"The Court: I'm sorry.
"[Juror]: R.L.
"The Court: Yes, sir, R.L.
"R.L.: II have a doctor's appointment tomorrow."
During the voir dire questioning R.L. indicated that he had been sick for some time with hypertension and heart disease and that he would like to be excused from service. This is a valid reason for striking a prospective juror. Lewis, supra; Stephens, supra.
There is no evidence that the reasons advanced by the prosecutor were a sham, nor is there evidence of disparate treatment between prospective black jurors and prospective white jurors. When the prosecutor explained his reasons for the strikes he also listed five white jurors who were struck because of their views on the death penalty. "The fact that the prosecutor's strike against a white veniremember was based on the same reason as *132 that for striking the black veniremember indicates that the reason was properly race-neutral." Travis v. State, 776 So.2d at 839.
Last, the standard used in reviewing a Batson issue gives great deference to the trial court's decision.
"`The trial court's ruling on a Batson motion will be reversed only if clearly erroneous. Nance v. State, 598 So.2d 30, 31 (Ala.Cr.App.1992); Jackson v. State, 594 So.2d 1289, 1294 (Ala.Cr.App. 1991). "It is well settled that the ruling of the trial court on a Batson hearing is entitled to substantial deference and will not be disturbed on review unless it is `clearly erroneous.'" Ex parte Bankhead, 625 So.2d 1146 (Ala.1993).'"
Farrior v. State, 728 So.2d 691, 698 (Ala. Cr.App.1998), quoting Merriweather v. State, 629 So.2d 77, 88 (Ala.Cr.App.1993). The record does not support the conclusion that the trial court's ruling on the Batson objection was clearly erroneous.

V.
Hall next argues that the trial court erred in failing to grant his motion to suppress evidence obtained as a result of what he says was an illegal search of Shiver's house, i.e., the curtilage of Shiver's property. Specifically, he contends that evidence discovered in the stolen vehicle, the murder weapon, and other items taken from Haskew's residence should have been suppressed because police did not have a warrant to enter the curtilage of Shiver's property to check the tag number of the car.
The evidence at the suppression hearing established that deputies had received information, as a result of the BOLO, that the stolen vehicle was seen parked outside Shiver's house in Uriah. Deputy James Powell of the Monroe County Sheriffs Department testified at the suppression hearing that, "The minute that we pulled up we could spot the car the minute we pulled up in the driveway." He said that the car matched the description of the stolen vehicle, i.e., it was the same model and color, and that he went and checked the tag number, which was not visible from the driveway. (The car was parked beside a camper trailer and the back of it was not visible from the street.) It is this entry into the yard to check the license number that Hall challenges on appeal as an illegal search.
Even if we were to concede that Hall has standing to object to the police officer's entering Shiver's yard to obtain the license number of the vehicle,[5] the situation did not implicate the Fourth Amendment protection against unreasonable searches and seizures. The Fourth Amendment does not protect society from all searchesonly unreasonable ones. Amend IV, United States Constitution, and Art. I, § 5, Alabama Constitution 1901.
"In Ellison v. United States, 93 U.S.App.D.C.1, 206 F.2d 476, the police officers sought to question the defendant concerning a burglary, and while on the front porch of his house saw some bottles of medicine and some cigarettes near the house in the yard which had been taken from a drugstore in the burglary. It was held: The `officers were perfectly entitled to go to appellant's *133 door, ring the bell, and inquire as to his whereabouts. They were not trespassers in so doing. Nor were they guilty of any impropriety in allowing their eyes to wander while they were waiting on the porch.... There was no intrusion into appellant's privacy. Nor did mere observation constitute a "search." If an officer sees the fruits of crime or what he has good reason to believe to be the fruits of crimelying freely exposed on a suspect's property, he is not required to look the other way, or disregard the evidence his senses bring him.' ...
[W]hen a police officer enters upon land in the performance of his duties and observes incriminating evidence, it is not the result of a search, let alone an illegal one, and ...' a police officer entering upon the land in performance of his lawful duty is a licensee ... the license being conferred by the law.'"
State v. Gott, 456 S.W.2d 38, 41 (Mo.1970). (Emphasis added.) See also Commonwealth v. Best-Bey, 258 Pa.Super. 478, 393 A.2d 459 (1978). It was not an unreasonable search for the police to enter the yard to check the tag number.
Having determined that the police did not violate the Fourth Amendment by entering Shiver's yard to check the tag number on the automobile, we are left to determine whether the search of the car was lawful. The prosecutor argued at trial that Hall lacks standing to challenge the search of the stolen vehicle. As this Court has stated:
"Whether a person has standing to contest the constitutionality of a search and seizure depends on whether that person has a reasonable expectation of privacy in the item(s) searched and/or seized. United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A general rule has developed, stating that a person's interest in his or her possession of stolen property is not a legitimate expectation of privacy society is willing to recognize as reasonable. See Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (fn. 4: Defendant's interest was `totally illegitimate'); United States v. Hensel, 672 F.2d 578 (6th Cir.), cert. denied, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982); United States v. Hargrove, 647 F.2d 411 (4th Cir.[1981]); Smith v. Garrett, 586 F.Supp. 517 (D.C.W.Va. 1984); McMillian v. State, 65 Md.App. 21, 499 A.2d 192 (1985); People v. Mercado, 114 A.D.2d 377, 493 N.Y.S.2d 896 (1985); Sanborn v. State, 251 Ga. 169, 304 S.E.2d 377 (1983); State v. Hamm, 348 A.2d 268 (Me.1975). See generally W. LaFave, 3 Search and Seizure § 11.3 (1978). Alabama follows this general rule. See, Nelson v. State, 405 So.2d 392 (Ala.Crim.App.1980), rev'd on other groundsBeck v. State, 396 So.2d 645 (Ala.1980)405 So.2d 401 (Ala.1981)."
Peoples v. State, 510 So.2d 554, 568 (Ala. Cr.App.1986), aff'd, 510 So.2d 574 (Ala.), cert. denied, 484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 266 (1987). See also Travis, supra. We conclude that Hall had no legitimate expectation of privacy in the stolen automobile and therefore that he had no standing to contest the constitutionality of the search.

VI.
Hall next argues that the trial court erred in allowing evidence of a crime not charged in the indictment to be received at trial. Specifically, he contends that it was reversible error to allow evidence of the burglary at Nellie Schad's house and evidence that a gun had been stolen during that burglary. Hall further asserts that there was no evidence that he was involved in the Schad burglary.
*134 This Court addressed this issue when it affirmed Travis's conviction. Travis argued that the trial court had erred in allowing the introduction of evidence of the Schad burglary, evidence of theft of Haskew's automobile, and evidence of damage to Haskew's truck.[6] The Court stated:
"[A]s we held in Twilley v. State, 472 So.2d 1130, 1135-37 (Ala.Cr.App.1985):
"`The rule has been stated many times by the appellate courts of this State that in a prosecution for homicide, evidence of connected acts and transactions leading up to and explanatory of the killing is admissible. Byrd v. State, 257 Ala. 100, 57 So.2d 388 (1952); Keith v. State, 253 Ala. 670, 46 So.2d 705 (1950); Levert v. State, 252 Ala. 308, 42 So.2d 532 (1949); Stallings v. State, 249 Ala. 580, 32 So.2d 236 (1947); McCoy v. State, 232 Ala. 104, 166 So. 769 (1936); Jordan v. State, 81 Ala. 20, 1 So. 577 (1886); Golden v. State, 39 Ala.App. 361, 103 So.2d 52, reversed on other grounds, 267 Ala. 456, 103 So.2d 62 (1958); Sexton v. State, 28 Ala.App. 59, 180 So. 729 (1937); Newman v. State, 25 Ala.App. 526, 149 So. 724 (1933); Roberts v. State, 25 Ala.App. 477, 149 So. 356 (1933).'
"In the present case, the collateral crimes involved were all part of one continuous criminal transaction, or res gestae, and the evidence relating to each offense was inseparable from evidence relating to the others."
Travis, 776 So.2d at 857-58.[7]
Also, the evidence clearly established Hall's connection to the Schad burglary. Hall and Travis were seen near Schad's residence around the time of the burglary, and the gun found in Haskew's car, which was identified as the murder weapon, was stolen from Schad's home.[8] Also, when deputies arrived at Shiver's house, both Hall and Travis fled the scene. When captured, Hall was in possession of seven bullets which fit the gun stolen from Schad's house and the gun that was identified as the murder weapon.

VII.
Hall next argues that the trial court denied him a fair trial by not allowing him to introduce evidence that his codefendant Travis was from the McKenzie area where the victim lived, had had a troubled childhood, had been convicted of several offenses such as burglary, and on one prior occasion had been arrested for stealing from the victim. Also, Hall wanted to present evidence that Travis had said that he was going to kill a former teacher when he was released from prison.[9] He argues in his brief to this Court, "By demonstrating Travis's pattern of escalating crimes against people in his hometown, as *135 well as his premeditation to kill, defense counsel sought to prove that Travis killed Mrs. Haskew and that Mr. Hall did not participate intentionally in her death."
As this Court stated in Alldredge v. State, 431 So.2d 1358, 1361 (Ala. Cr.App.1983):
"The appellate courts of this state have recognized that one accused of a crime may show his innocence by proof of the guilt of another, provided that the evidence relates to the res gestae of the offense and exonerates the accused. Allen v. State, 382 So.2d 1147, 1156 (Ala. Cr.App.), cert. denied, Ex parte Allen, 382 So.2d 1158 (Ala.1980). See also Underwood v. State, 239 Ala. 29, 193 So. 155 (1940); Renfroe v. State, 382 So.2d 627 (Ala.Cr.App.), cert. denied, 382 So.2d 632 (Ala.1980). This rule is clarified in C. Gamble, McElroy's Alabama Evidence, Section 48.01 (3rd ed.1977).
"`A careful analysis of all the pertinent decisions will reveal that the true test of whether evidence of another's guilt is admissible lies within the sound discretion of the trial judge. A particular fact or collection of facts indicating guilt of one other than the accused is admissible if, but only if, the deciding authority, in the light of his own experience, feels that the whole of the offered evidence tending to show another's guilt is worth considering. It is quite clear, on the other hand, that the whole or totality of the evidence offered as tending to show another's guilt need not be of such strength as to warrant a finding of such other's guilt.' McElroy's, Section 48.01(1).
"Generally, an accused may not prove that another planned, designed or threatened to commit the crime for which he is charged unless there is evidence in addition to the evidence of the plan or threat `pointing with strength' to such other's guilt. McElroy, Section 48.01(6)."
This Court also stated the following in Allen v. State, 382 So.2d 1147 (Ala.Cr. App.), cert. denied, 382 So.2d 1158 (Ala. 1980), which the Alldredge court cited:
"Even though one accused of a crime may show his innocence by proof of the guilt of another, provided the evidence relates to the res gestae of the offense, such evidence must exonerate the accused. As stated in Blevins v. State, 51 Ala.App. 214, 283 So.2d 664 (1973):
"`"While it is always proper and relevant for accused to show that someone else committed the crime without his aid or participation, the admissibility of evidence offered to establish such fact depends on the circumstances of the case as well as the character of the evidence offered; but in general competent evidence which tends to prove that another committed the crime for which the accused is being tried is admissible if it is inconsistent with the guilt of the accused." (Emphasis supplied).' (283 So.2d 670)."
382 So.2d at 1156.
What Hall fails to consider is that there was ample evidence which showed that Hall and Travis were both active participants in the burglary-murder. Both were seen around the scene of the Schad burglary around the time of its occurrence. Also, when Travis was arrested he had in his pocket bullets for the stolen gun, which was later proved to be the murder weapon. Moreover, Hall's flight from the Shiver house tended to show a consciousness of guilt. The evidence was correctly excluded because it was not relevant to Hall's innocence, i.e., it did not tend to exonerate Hall.

*136 VIII.
Hall also argues that he was denied a fair trial because of the prosecutor's allegedly improper and highly prejudicial extrajudicial statements to the media. Specifically, he contends that the district attorney violated Rule 3.6, Ala.R.Prof. Cond., by commenting to the press shortly after Hall's arrest that Hall had a prior record, that satanic symbols had been spray painted on the walls of Haskew's home, and that if Hall and Travis were lucky enough to survive their injuries he would see that they were executed.
As the State argues in its brief to this Court that, even if we were to find that the district attorney violated the Rules of Professional Conduct, we would find no violation of Hall's right to a fair trial.[10] As this Court stated in Whisenhant v. State, 555 So.2d 219 (Ala.Cr.App.1988), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990):
"This appellant alleges that the attorney general's pretrial press conference constituted prosecutorial misconduct which denied this appellant of due process. The appellant alleges that this press conference violated a long standing injunction and violated the Code of Professional Responsibility of the Alabama State Bar, specifically, Disciplinary Rule 7-107.
"In reviewing this appellant's allegations of prosecutorial misconduct, this court finds that the appellant was not deprived of due process nor prejudiced in any way. The prospective jurors were polled by the trial judge prior to the jury selection process. The judge asked, `Is there any member of the jury who thinks because of the recollection that you may have about this case, whether it be from radio, television or newspaper, that it would be impossible for you to sit as a fair and impartial juror in the penalty stage of this case? That is[,] what you have read, what you have seen or heard on television, would that in any way bias or affect you in any way from rendering a fair and impartial verdict in this case. If you feel that it would simply raise your hand.' All jurors who raised their hands were excused.
"In reviewing the record, we find that the trial judge carefully considered this matter while hearing the appellant's motion for change of venue. There was no abuse of discretion by the trial court, and the appellant was not deprived of a fair and impartial trial. Thus, the trial court properly denied the appellant's motion for change of venue in which it considered the prejudicial effects of the news conference in question. See Robinson v. State, [430 So.2d 883 (Ala.Cr. App.1983) ]; Acoff v. State, [50 Ala.App. 206, 278 So.2d 210 (1973) ]; Botsford v. State, [54 Ala.App. 482, 309 So.2d 835 (1975)]; Nelson v. State, [440 So.2d 1130 (Ala.Cr.App.), cert. denied, 440 So.2d 1130 (Ala.Cr.App.1983) ]."
555 So.2d at 224-25.
As previously noted the voir dire examination was extensive. The panels were questioned about media coverage surrounding the case. Each prospective juror indicated that he or she could base his or her decision on the evidence presented at trial. No violation of Hall's constitutional rights occurred here.

IX.
Hall next argues that the trial court violated his right to be present at *137 every phase of the trial when the court conducted an off-the-record hearing outside his presence.
Initially, we note that this issue was not brought to the attention of the trial court; thus, our review is limited to whether plain error occurred. Rule 45A, Ala.R.App.P.
The record reflects that at the end of the State's case-in-chief defense counsel moved for a judgment of acquittal, arguing that there was a material variance in the indictment. The trial court stated:
"The Court: I want to take a short recess. I would like to see counsel and my court reporter, with his notes of Dr. Wanger's [a pathologist] testimony, in my chambers.
"(Whereupon, there was a short recess in the proceedings, following which the following occurred, to-wit:)
"The Court: Let me note for the record that during the argument, the Court adjourned to chambers to listen to the tape of Dr. Gregory Wanger, made no rulings or took no action while in chambers. Counsel for the State and Defense did accompany me and were able to listen to the tape at the same time the Court did."
Initially, as the State notes in its brief to this Court, there is absolutely no indication in the record that Hall was not present at this off-the-record conference. As this Court has often stated, "We will not predicate error on a silent record." Maples v. State, 758 So.2d 1 (Ala.Cr.App. 1999), citing, Foster v. State, 587 So.2d 1106 (Ala.Cr.App.), opinion extended after remand, 591 So.2d 151 (Ala.Cr.App.1991).
Even if we were to assume that Hall was absent from this hearing, we would still conclude that no violation of Hall's constitutional rights occurred here. As this Court reiterated in Borden v. State, 769 So.2d 935 (Ala.Cr.App.1997):
"Recently, in Ponder v. State, 688 So.2d 280 (Ala.Cr.App.1996), this court stated:
"`"The court in Proffitt v. Wainwright, [685 F.2d 1227 (11th Cir.1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983) ], acknowledged in a footnote that in Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), `which was a capital case, [the Court] stated the sixth amendment privilege of confrontation could "be lost by consent or at times even by misconduct." Snyder v. Massachusetts, 291 U.S. at 106, 54 S.Ct. at 332.' Proffitt v. Wainwright, supra, at 1257, n. 43. See also State v. Davis, 290 N.C. 511, 227 S.E.2d 97, 110 (1976) (`[t]he strict rule that an accused cannot waive his right to be present at every stage of his trial upon an indictment charging a capital felony, State v. Moore, 275 N.C. 198, 166 S.E.2d 652 (1969), is not extended to require his presence at the hearing of a pretrial motion for discovery when he is represented by counsel who consented to his absence, and when no prejudice resulted from his absence'). See also State v. Piland, 58 N.C.App. 95, 293 S.E.2d 278 (1982), appeal dismissed, 306 N.C. 562, 294 S.E.2d 374 (1982) (`[t]he [capital] defendant in this case has not demonstrated any prejudice to him by his absence from a part of the hearing. The evidence elicited was not disputed and there has been no showing that it would have been different had the defendant been present').
"`"Thus, if the appellant's presence... would have been useless to [his] defense and if the [pretrial] hearing was not considered to be a `critical stage' of [his] trial, then we can find *138 no error in the appellant's absence from the hearing."'
"688 So.2d at 285, quoting Harris v. State, 632 So.2d 503, 512 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (emphasis in Harris). See also Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr.App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); Ex parte DeBruce, 651 So.2d 624 (Ala.1994); Burton v. State 651 So.2d 641 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995)."
769 So.2d at 943.
Since this Court released Borden we have had several occasions to address this issue and on each occasion we found no reversible error. See McWhorter v. State, 781 So.2d 257 (Ala.Cr.App.1999) (McWorter's absence from initial qualifying of the jury venire was not reversible error); Sneed v. State, 783 So.2d 841 (Ala.Cr.App. 1999), and Hardy v. State, 804 So.2d 247 (Ala.Cr.App.1999)[11] (Sneed's and Hardy's absence from in-chambers hearing concerning redaction of statements and in-chambers hearing concerning jury's request during deliberations for two videorecorders was not error). See also Burgess v. State, 723 So.2d 742 (Ala.Cr.App. 1997) (Burgess's absence from two pretrial motion hearings, an in-chambers discussion with counsel and the victim's family during voir dire, and an in-chambers discussion with counsel about suspending Burgess's telephone privileges was not reversible error).
Hall has not shown that he was prejudiced by his absence from this off-the-record discussion where his attorney was present. No error, much less plain error, occurred here.

X.
Hall also argues that the trial court erred in failing to, ex mero motu, give a jury instruction on felony murder as a lesser offense to capital murder. There was no request for a felony murder instruction at trial; thus, we must review this contention under the plain-error doctrine. Rule 45A, Ala.R.App.P. Here, the trial court instructed the jury on the lesser offenses of burglary and murder.
Even in a capital case a defendant is not entitled to instructions on a lesser included offense unless there is a rational theory from the evidence presented supporting such an instruction. Roberts v. State, 735 So.2d 1244 (Ala.Cr.App. 1997). As we stated in Jenkins v. State, 627 So.2d 1034, 1049-50 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994):
"The appellant next argues that the trial court erred in not instructing the jury on the lesser included offense of felony-murder. `An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position.' McMillian [v. State], 594 So.2d [1253] at 1267 [ (Ala.Cr.App.1991) ]. (Emphasis added.) As Judge Bowen stated in White v. State, 587 So.2d 1218, 1231 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992):
"`"The purpose of the felony-murder doctrine is to hold felons accountable *139 for unintended deaths caused by their dangerous conduct." W. LaFave and A. Scott, 2 Substantive Criminal Law § 7.5 at 210 (1986).'
"(citations omitted). There was no evidence to support an instruction on felony-murder. In the instant case the evidence revealed that the victim died as a result of manual strangulation. `There is no rational basis for a verdict convicting him of felony-murder.' White, 587 So.2d at 1231; § 13A-1-9(b), Code of Alabama 1975."
Also, we stated in Dobyne v. State, 672 So.2d 1319, 1345 (Ala.Cr.App.1994), on remand, 672 So.2d 1353 (Ala.Cr.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996):
"Lesser included offense instructions should be given when there is a `reasonable theory from the evidence' supporting such an instruction. Jenkins [v. State, 627 So.2d 1034 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993) ]. Here, there was no reasonable theory to support a charge on felony-murder. `"The purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct.'" White v. State, 587 So.2d 1218, 1231 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992). Here, the evidence did not show that the shootings were unintended. The court did not err in not instructing the jury on the lesser included offense of felony-murder."
The evidence showed that Haskew was shot twice in the head, beaten repeatedly, and strangled. There was absolutely no evidence presented that would bring the murder into the definition of felony murder. The manner of the killing showed that the killing was not an "unintended" murder that would fall under the definition of felony murder.

XI.
Hall also argues that the conduct of the prosecutor rendered his trial unfair and denied him due process. Hall cites four instances of what he alleges is prosecutorial misconduct in the guilt phase of the proceedings.
We quote the following from this Court's opinion in Davis v. State, 494 So.2d 851, 853 (Ala.Cr.App.1986), which states the role of the prosecutor:
"It is, of course, the duty of every prosecutor to represent the interests of the state zealously, vigorously, and earnestly. His `responsibility [as] a public prosecutor differs from that of the usual advocate; [his] duty is not merely to convict, but also to protect the innocent.' EC7-13, Alabama Code of Professional Responsibility. `The prosecuting attorney owes a duty to exercise his full powers in furtherance of society's valid and strong interest in enforcement of criminal laws, not only in seeing that the guilty are punished but that criminal acts by others are discouraged by example of such punishment.' Sprinkle v. State, 368 So.2d 554, 561 (Ala.Cr.App. 1978), writ quashed, 368 So.2d 565 (Ala. 1979).
"The prosecutor's responsibility is eloquently explained in the following passage
"`The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As *140 such, he is in a peculiar and very definite sense the servant of the law. The twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigorindeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
"`It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'

"Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)."
Initially, we observe that the trial court instructed the jury that comments of counsel were not evidence in the case. Also, we have repeatedly stated that, "`Statements of counsel in argument to the jury must be viewed as having been made in the heat of the debate, and such statements are usually valued by the jury at their true worth.'" Stephens v. State, 580 So.2d 11, 22 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991), quoting Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App.1988). Moreover, a prosecutor is free to argue his impressions of the evidence. Freeman, infra.
"`In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981).'"
Callahan v. State, 767 So.2d 380, 392 (Ala. Cr.App.1999). For an argument by counsel to amount to reversible error it must "have so infected the trial with unfairness, taken in the context of the whole trial, that the appellant is entitled to a new trial. See Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)." Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994).
With these principles in mind, we will consider the challenged comments made by the prosecutor in the guilt phase.

A.
Hall argues that the prosecutor improperly urged the jury to find Hall guilty of capital murder so that it could "send a message" to the community. The following occurred during rebuttal closing argument by the prosecutor:
"Mr. Chapman [prosecutor]: ... This Defendant, this Defendant, is guilty of doing that. And the evidence cries out for that. You, as a jury of Monroe County, I'm asking you to go back there and find this Defendant guilty of capital murder because the evidence speaks for nothing else. You have to send a message out to Monroe County
"Mr. Brown [defense counsel]: Judge, we object to any type of message
"The Court: Sustain.
"Mr. Brown: And I ask for a curative instruction.

*141 "The Court: Ladies and gentlemen, your function in this case is to do justice, to resolve the issues in the case, not to send any messages.
"Mr. Chapman: Each and every one of us have a right to be safe in our homes. To be safe. It is said somewhere that a home is your castle. And you have a right to be safe therein. If elderly women, whose husbands have passed away and whose children have moved away, do not have a right to be safe in [their] home against this kind of intrusion, then we don't have a safe world to live in.
"To not convict this man of capital murder would be saying to him it's okay. It's okay. He deserves to be convicted of capital murder because the evidence in this case says he's guilty. And he deserves to be convicted of capital murder because I intend to come back here, after you do that, and ask you to give him the death penalty. Thank you.
"The Court: Ladies and gentlemen, punishment has no part in your decision here. We're here in this part of the trial to decide the issues of guilt or innocence."
Initially, we observe that the appellant has no adverse ruling from which to appeal. In each instance the trial court instructed the jury to disregard the complained of arguments. The trial court also instructed the jury, during its oral charge, that "[Y]ou are not to concern yourselves, at this time, with any issue of punishment." As we have previously stated, "The trial court's immediate curative instruction concerning the prosecution's comment creates a prima facie presumption against error. Holliday v. State, 641 So.2d 325, 329 (Ala. Cr.App.1994); Mathis v. State, 414 So.2d 151 (Ala.Cr.App.1982)." Smith v. State, 756 So.2d 892, 927 (Ala.Cr.App.1998), aff'd, 756 So.2d 957 (Ala.2000).
Furthermore, it is appropriate for a prosecutor to make a general appeal for law enforcement. Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999).

B.
Hall next alleges that the prosecutor "created facts to plug holes in the State's case and exaggerated the brutality of the crime" and, thus, that he deprived Hall of a fair trial. He cites specifically to the fact that when Ed Schad read into evidence as part of his testimony the serial number of the gun he had given his wife, Nellie Schad, which had been stolen from her home, one number was different from the serial number on the weapon recovered from the stolen vehicle and shown to be the murder weapon. However, even without the serial number there was evidence that showed that the gun recovered from the stolen car and identified as the murder weapon was the same gun stolen from the Schads' home. Both Nellie and Ed Schad identified the gun, and the gun was discovered with other items taken from their home.
Also, we fail to see how any prosecutor could exaggerate the brutality of this murder. The brutal nature of the murder was more than supported by the evidence presented at trial. It is permissible for a prosecutor to argue his impressions of the evidence. Freeman, supra. Moreover, the jury saw the photographs and a videotape of the crime scene. The members of the jury were left to make their own determination on the brutality of the murder.

C.
Hall alleges that the prosecutor misstated the law concerning reasonable doubt. Hall complains that the prosecutor stated that reasonable doubt is "a doubt for which you can give a particular reason after considering all of the evidence" and *142 that this definition raised the level of doubt needed for an acquittal.
The trial court instructed the jury that arguments of counsel were not evidence, and it gave a detailed instruction on reasonable doubt. Certainly, the prosecutor's comment concerning the definition of reasonable doubt, which was not an incorrect statement of the law, did not "so infect the trial with unfairness" that Hall is entitled to a new trial. Darden v. Wainwright, supra.

D.
Last, Hall argues that the prosecutor disparaged his attorneys and his defense and thereby violated his constitutional right to a fair trial when he made the following argument in rebuttal to defense counsel's closing argument in the guilt phase:
"Mr. Chapman [prosecutor]: Cary Travis [codefendant's father] told you about the relationship [the defendant] and [the codefendant] had. Yeah, he said that Wayne [codefendant] was addicted to gasoline and he wanted Steve to help him. But, is there any evidence whatsoever that anybody was high or intoxicated during any of this period of time? Did anybody sniff any gasoline? Did any drugs, did any drinking. No, not one bit. That's like a lot of other stuff you've heard. That's a smoke screen. There's no evidence of that.

"These things that I'm talking to you about are evidence in this case. They come back in, they play cards, sit around and talk. Wayne comes in. He goes to sleep. Steve and her retire to the bedroom. She hears a car drive up. She goes to the door. And who's right behind her running up to the door. Wayne Travis. No. Steve Hall, the Defendant."
(Emphasis added.) The highlighted portions are the challenged comments.
Hall argues that the prosecutor's reference to his defense as a smoke screen "insinuated that Mr. Hall's defense lacked an evidentiary basis and, thereby, encouraged the jury not to take it seriously. Moreover, the comment suggested that defense counsel were nothing more than forensic prostitutes trying to mislead the jury by spreading lies and legal disinformation." Last, Hall contends that the "smoke screen" reference also resulted in punishing Hall for exercising his right to counsel.
Initially, we note that no objection was made to the above argument of counsel; thus, we are confined to reviewing this argument under the plain-error doctrine. "`"This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful."`" Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999), quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting in turn Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).
We have found no reversible error when reviewing much more egregious comments by prosecutors in closing argument. See Crook v. State, 276 Ala. 268, 160 So.2d 896 (1963), cert. denied, 276 Ala. 702, 160 So.2d 897 (1964) (the argument, "You don't listen to some new fangled, disgusting theory that springs out from the minds of the imaginative lawyers" was held not to amount to reversible error; the Court also noted that the most common argument *143 made during the course of a trial is that the opposing position is "unwarranted, silly, fanciful, or illogical"), and Little v. State, 34 Ala.App. 114, 39 So.2d 587 (1948), cert. denied, 252 Ala. 81, 39 So.2d 593 (1949) (the argument, "It is a disgrace that [defense counsel] would come in and try to get the jury to believe any evidence such as that" was not reversible error).
As this Court stated in Thomas v. State, 393 So.2d 504 (Ala.Cr.App.1981): "`[A] trial is a legal battle, a combat in a sense, and not a parlor social affair.'" Quoting Arant v. State, 232 Ala. 275, 167 So. 540 (1936).
We do not believe that the comments made by the prosecutor amounted to error, much less, plain error.

Penalty Phase

XII.
Hall argues that the prosecutor's argument in the penalty phase denied him a fair trial and amounted to reversible error. We use the standard of review set out by this Court in Part XI of this opinion.

A.
The first complained-of comment occurred when the prosecutor stated the following in his closing argument:
"You can vote for life without parole. But, ladies and gentlemen of the jury, look at the facts of this case. What kind of break did they give Clarene Haskew. What kind of break did they give this 69-year-old woman who had fought two brain tumors, who, on her birthday, only wanted to be with her family, to retire that night peacefully in her country home."
Hall argues that the above comment urged the jury to vote for the death penalty based on a nonstatutory aggravating circumstances, i.e., the victim's age and bad health. We do not agree with Hall's interpretation of the above comment. The prosecutor was arguing that the jury should vote for the death penalty instead of life imprisonment without parole. It is inconceivable that this comment could have so infected Hall's trial with unfairness as to entitle Hall to a new trial. Darden v. Wainwright. Furthermore, the comment was in the nature of a call for law enforcement, which is a permissible subject of comment by the prosecutor. Hutcherson v. State, 727 So.2d 846 (Ala.Cr.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999); George v. State, 717 So.2d 849 (Ala.Cr.App.1997), aff'd, 717 So.2d 858 (Ala.), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998).

B.
The next challenged remark was the following comment made in closing argument:
"Some people turn out bad and some turn out good. Steve Hall is bad. And the law has a way of dealing with people like that. The law has a way of dealing with people who are evil, who are cruel, who will take a defenseless, pitiful, harmless, 69-year-old woman and beat her and drag her. And that's not the actions of one man. You can look at the evidence and see the things that were done to her. They shoot her in the back of the head twice. And then what do they do? Then what do they do? They deface her house. They tear up her house. They take items of close personal value with herwith them. They made their own choice. Steve Hall made his own choice. And his choice was murder, intentional murder during the course of burglary. An atrocious, heinous, cruel crime that deserves only *144 one punishment. And that's the death penalty."
Hall argues that the above comment created a presumption in favor of the death penalty. We do not agree. The State has the burden of proving that the aggravating circumstance that the murder was especially heinous, atrocious, or cruel applied to the case. Also, the State has the burden of proving that the aggravating factors outweigh the mitigating ones and mandate a sentence of death. This argument went directly to the State's burden of proof; it did not amount to error.
The challenged comments at the penalty phase showed a prosecutor who was zealously presenting the State's case to the jury. There was no error here.

XIII.
Hall next argues that the trial court's jury instructions in the penalty phase were flawed for several reasons.
This Court in Maples, 758 So.2d at 65, stated:
"When reviewing the challenged jury instructions, we bear in mind the following principles. A trial court has broad discretion in its formulation of jury instructions. Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court's instructions, `"the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together."' Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992)."

A.
Initially, Hall argues that the trial court's instructions concerning mitigating evidence implied to the jury that its findings as to mitigating evidence had to be unanimous. Specifically, he cites the court's use of the word "you" when giving his jury instructions.
This jury instruction was not objected to at trial; thus, our review is limited to the plain-error doctrine. Rule 45A, Ala. R.App.P.
This Court addressed a similar issue in Freeman v. State, 776 So.2d 160 (Ala.Cr. App.1999):
"Freeman also contends that the trial court erred by failing to instruct the jury that its findings as to mitigating circumstances did not have to be unanimous. In failing to so instruct the jury, he says, the trial court implied that the jurors had to unanimously agree before they could find the existence of a mitigating circumstance. Freeman did not object at trial to the trial court's instructions to the jury concerning mitigating circumstances; therefore, we will review this claim under the plain error rule. Rule 45A, Ala.R.App.P. We have reviewed the trial court's instructions to the jury; we find nothing in the instructions that would have suggested to the jurors, or given them the impression, that their findings concerning the existence of mitigating circumstances had to be unanimous. See Coral v. State, 628 So.2d 954, 985 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997).
"As we stated in Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, *145 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), in rejecting a claim identical to Freeman's:
"`In Mills v. Maryland, 486 U.S. [367] at 384, 108 S.Ct. 1860, 100 L.Ed.2d 384 [(1988)], the United States Supreme Court held that a sentence of death must be vacated where "there is a substantial probability that reasonable jurors, upon receiving the judge's instructions ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." Again, no objection was made to the instructions in the trial court.
"`Section 13A-5-45(g) provides:
"`"The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
"`The instructions to the jury in the present case concerning the manner of establishing the existence of mitigating circumstances were in accordance with § 13A-5-45(g) and the Alabama Pattern Jury Instructions: Criminal. The jury was instructed that the appellant had the burden of interjecting a mitigating circumstance, but once it was interjected the state had the burden of disproving the factual existence of any mitigating circumstance by a preponderance of the evidence. The court gave no instruction suggesting that a finding of a mitigating circumstance had to be unanimous.
"`The Alabama Supreme Court addressed this identical issue in Ex parte Martin, 548 So.2d 496, 499 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), and held that under the instructions given in Martin, "the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor." For cases following Martin, see Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App. 1994); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). The instructions given in Martin are substantially the same as those given in the instant case. After reviewing the instructions in the present case in their entirety, we conclude that there is no reasonable likelihood or probability that the jurors believed or could have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating circumstance. The instructions were not only legally correct, but were clear and understandable. The case relied upon by the appellant, Mills v. Maryland, is factually distinguishable from the instant case. We find no merit in the appellant's contention, and no plain error in the instructions.'
"710 So.2d at 1307; see also Weaver v. State, 678 So.2d 260, 282 (Ala.Cr.App. 1995), rev'd on other grounds, 678 So.2d 284 (Ala.1996).
"Here, as in Williams, the jury was properly instructed that once Freeman *146 offered a mitigating circumstance, the State had the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. No portion of the trial court's instructions suggested to the jury that its findings concerning mitigating circumstances had to be unanimous. Moreover, the trial court's instructions were in accordance with the Alabama Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178. After reviewing the trial court's instructions, we find that there was `no reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstance.' Williams, 710 So.2d at 1307."
776 So.2d at 195-96. Use of the word "you," without more, in relationship to a jury charge on mitigating evidence does not imply that the finding of a mitigating circumstance must be unanimous. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
The instruction did not imply that the finding of mitigating evidence had to be unanimous. There was no error, much less plain error, in the trial court's instruction on mitigating evidence.

B.
Hall also argues that the trial court's instructions regarding the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses were erroneous. Specifically, he asserts that the trial court defined the term in an "overbroad manner." He states that because the court used the conjunction "or" to connect the words "atrocious" and "cruel," the trial court failed to instruct the jury that its decision as to each element of the aggravating circumstance had to be unanimous, it failed to distinguish between conduct that is heinous and conduct that is atrocious, and placed undue emphasis on the phrase "unnecessarily torturous."
The trial court's instructions on the especially heinous, atrocious, or cruel aggravating circumstance were substantially similar to the pattern jury instructions on this aggravating circumstance and were extremely thorough. The court's instruction read, in part:
"Now, ladies and gentlemen of the jury, I charge you that the State contends that the murder in this case was especially heinous, atrocious, or cruel. The State has the burden of proving this statutory aggravating circumstance, beyond a reasonable doubt. You are cautioned that all murders are horrible. The burden upon the State with regard to this aggravating circumstance is to prove, beyond a reasonable doubt, that the act of killing in this case was especially heinous, atrocious, or cruel and involved special factors which I will define for you as to set it apart from other murders.
"The term `heinous' means extremely wicked or shockingly evil.
"The term `atrocious' means outrageously wicked and violent.
"The term `cruel' means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. What is intended to be included in this aggravating circumstance is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
"For a capital offense to be especially heinous or atrocious, any brutality which *147 is involved in it must exceed that which is normally present in any capital offense.
"For a capital offense to be especially cruel, it must be a conscienceless or a pitiless crime which is unnecessarily torturous to the victim.
"Now all capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance [are] only those cases in which the degree of heinousness, atrociousness or cruelty far exceeds that which will always exist when a capital offense is committed."
We commend the trial court for its thorough instruction on the definition of the term "especially heinous, atrocious, or cruel." The trial court defined that term as it was defined by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330 (Ala.1981). See also Ex parte Clark, 728 So.2d 1126 (Ala.), on remand, 728 So.2d 1141 (Ala.Cr.App.1998), and Norris v. State, 793 So.2d 847 (Ala.Cr.App.1999).
We are puzzled as to why Hall argues that the trial court erred in defining the term by using "or" between atrocious and cruel. Hall argues in brief, "Because the instruction was stated disjunctively, the jury was allowed to find that the aggravator existed even if it found that the crime was only heinous, only atrocious, or only cruel." Hall's argument is contrary to the statutory definition of this aggravating circumstance which specifically states, "The capital offense was especially heinous, atrocious or cruel compared to other capital offenses." Section 13A-5-49(8), Code of Alabama 1975. This argument is therefore without merit.
A review of the trial court's instructions on this aggravating circumstance reflects that the instructions were both correct and thorough. The trial court instructed the jury that the finding of this aggravating circumstance had to be unanimous. Neither did the trial court unduly emphasize this instruction.

XIV.
Hall next argues that the trial court erred in not submitting a verdict form that allowed the jury to vote for life imprisonment if it determined that the State had failed to prove any aggravating circumstance.
We are baffled by Hall's argument, which conflicts with the facts of the case. A verdict form showing that no aggravating circumstances had been proven would have been incorrect based on the jury's verdict in the guilt phase. Here, by virtue of the fact that the jury found Hall guilty of burglary-murder, an aggravating circumstance was already found to exist as a matter of law, i.e., that the murder was committed during the course of a burglary, § 13A-5-49(4). Use of an element of the capital offense as an aggravating circumstance is known as "double-counting" or "overlapping" and has repeatedly been upheld. Stewart v. State, 730 So.2d 1203 (Ala.Cr.App.1997), aff'd, 730 So.2d 1246 (Ala.1999); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel, supra. This issue is without merit.

XV.
Hall also argues that the prosecutor failed to prove that the murder was *148 especially heinous, atrocious, or cruel when compared to other capital murders. Specifically, he contends that the State failed to introduce evidence concerning other capital murders so that the jury could make a comparative analysis. Hall cites no law in support of this contention.
We have specifically addressed this argument and found no error. As this Court stated in Hutcherson v. State, 727 So.2d 846, 859 (Ala.Cr.App.1997), aff'd, 727 So.2d 861 (Ala.1998):
"The appellant's fifth argument is that the trial court erred in finding as an aggravating circumstance that the offense was especially heinous, atrocious, or cruel when compared to other capital offenses. Specifically, he contends that the State did not introduce evidence of and the trial court did not take judicial notice of other capital cases in which the death penalty was imposed for comparison with this case. Because the appellant did not raise this issue at trial, we will review it under the plain error standard.
"`In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under § 13A-5-49(8) is that for a crime to fit within that section it must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
"`. . . .
"`... On the issue of aggravating circumstances, Bankhead suggests that the jury should have had the opportunity to compare the capital offense in this case with other capital offenses for purposes of § 13A-5-49(8).
"`Although a very narrow and literal reading of the statute may suggest that such a comparison is required, it would be virtually impossible for the court to implement. Charging the jury on pertinent facts of "other capital cases" would unduly burden the court. It would be unworkable for the court and would thoroughly confuse the jury.
"`This Court has decided upon an approach for the purposes of § 13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was "especially heinous, atrocious or cruel," the court uses the Kyzer standard. Capital offenses falling under § 13A-5-49(8) are, pursuant to the Kyzer standard, those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Kyzer, 399 So.2d at 334.'

"Ex parte Bankhead, 585 So.2d 112, 124-25 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993)."

Trial Court's Sentencing Order

XVI.
Hall next argues that the trial court deprived him of the right to have the jury consider the mitigating circumstance of his age at the time of the burglary-murder because, he says, the court wrongfully stated in its order that he was 22 years old at the time of the murder instead of 21.
There was no objection made to the trial court. We apply the plain error rule. Rule 45A, Ala.R.App.P.
The presentence report reflects that Hall was 21 at the time of the murder but was two weeks away from his twenty-second birthday. The trial court in its sentencing order stated the following: *149 " § 13A-5-51(7), `The age of the defendant at the time of the crime.' The Court finds that this circumstance is not a mitigating circumstance. The Defendant was twenty-two years of age at the time he committed the crime."
The Alabama Supreme Court addressed an identical issue in Boyd v. State, 715 So.2d 852 (Ala.1998), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998):
"The final issue we address is whether the trial court's erroneous finding regarding Boyd's age at the time of the offense requires that this case be remanded for resentencing. At sentencing, the trial court found the existence of two aggravating circumstances: that the capital offense was committed while Boyd was engaged in the commission of a kidnapping and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, see Ala.Code 1975, § 13A-5-49(4) and (8), respectively. The only mitigating factor the trial court found was that Boyd did not have a significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975. In determining that only one mitigating factor was present, the trial court calculated that Boyd was 23 years old at the time of the offense and found that his age was not a mitigating circumstance. See § 13A-5-51(7), Ala.Code 1975. The record indicates, however, that Boyd's date of birth was September 5, 1971. Therefore, while he was 23 years old when the trial court sentenced him on May 19, 1995, Boyd was actually about 21 years and 11 months old when he committed the crime on July 31, 1993. It does not appear from the record, though, that Boyd's counsel brought the age miscalculation to the trial court's attention.
"In this Court, Boyd argues that, had the trial judge correctly determined his age at the time of the crime, it might have found that an additional mitigating factor existed and that if it had found this additional factor, this might have affected the court's weighing of all aggravating and mitigating factors, the process that constitutes the individualized sentencing determination. See §§ 13A-5-47(e), 13A-5-48, Ala.Code 1975; Clisby v. State, 456 So.2d 102 (Ala.Cr.App.1983), aff'd, 456 So.2d 105 (Ala.1984), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985). The Court of Criminal Appeals acknowledged in its opinion that Boyd alleged that the trial court had miscalculated his age, 715 So.2d at 839, but that court's opinion did not address the potential impact of that particular error upon the sentencing. However, because Boyd did not object at trial, this issue is reviewable only under the `plain error' standard. Rule 45A, Ala.R.App.P., Kuenzel, supra. While conceding that the trial court miscalculated Boyd's age, the State argues that this error does not warrant a remand because, given the especially heinous nature of the crime, the trial court's determinations that Boyd's age was not a mitigating factor and that death was the appropriate sentence were reasonable notwithstanding the error.
"In Ex parte Land, 678 So.2d 224 (Ala.1996), [aff'd, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996) ], we considered a similar factual situation. In that case, the trial court's order sentencing the defendant to death stated that the defendant was `five days short of his 24th birthday' when he committed the capital murder, when in truth the defendant had actually been five days short of his 23rd birthday. Id. at 242. This Court recognized, however, that the defendant had not objected to this error, either at *150 his sentencing hearing or on direct appeal, and that the issue was therefore reviewable only under the `plain error' standard. Id. Reasoning that `whether he was five days short of 23, or five days short of 24, [the defendant] was clearly an adult, not a minor, when he killed [the victim],' this Court held that the trial court's miscalculation of the defendant's age by one year did not constitute plain error. Ex parte Land, at 242-43.
"We reach the same result in Boyd's case. It would seem that the greater the trial court's substantive miscalculation of a defendant's age, the more prejudicial it might be to the defendant. The trial court miscalculated Boyd's age by only slightly more than the one year in Land, so this consideration does not suggest materially greater prejudice. However, we are aware of at least one other reported case in which the same trial judge who sentenced Boyd to death, Judge Jerry L. Fielding, found that a capital defendant's age of 21 years when he committed the offense was a mitigating factor. See Ex parte Henderson, 616 So.2d 348, 349 (Ala. 1992). But `plain error' exists only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the proceedings or if it has or probably has affected a substantial right of the defendant. Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). We find that, as was the case in Land, `[the defendant] was clearly an adult, not a minor, when he killed [the victim].' 678 So.2d at 242. Thus, we cannot say that the trial court's miscalculation of Boyd's age rose to the level of `plain error.'"
715 So.2d at 855-56. See also Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999) (trial court's statement in sentencing order that Ingram was 24 instead of 22 was not plain error).
The trial court found the existence of no statutory mitigating circumstances. However, the court found that certain nonstatutory mitigating evidence was present, i.e., Hall's background and his childhood. The trial court also stated that it had read the presentence report. Hall's correct date of birth was stated in the presentence report. The report also lists Hall's criminal history, i.e., youthful offender adjudications and three prior burglary convictions. There is absolutely no evidence that the trial court erred in failing to find age as a mitigating circumstance. The circumstances surrounding the burglary/murder reflect those of a mature individual. We are confident that the fact that the trial court stated that Hall's age was 22 instead of 21 did not amount to plain error.

Post-trial Motion

XVII.
Hall last argues that the trial court erred in not allowing him to supplement the record with audiotapes of the voir dire examination and certain off-the-record discussions that were held during the course of the trial. The trial court held a hearing on this motion and, after discussing the motion with the attorneys denied the motion to supplement. We note that the transcript of this case consists of 48 volumes.
Hall was furnished with a transcribed copy of the voir dire examination. No law in Alabama imposes the additional burden on the State of having to furnish an audiotape of proceedings that were transcribed. Furthermore, the record was supplemented with nine volumes of juror questionnaires. It appears from the record of the hearing that counsel was satisfied that the court supplemented the record with the juror questionnaires and not with the audiotapes *151 of the entire voir dire proceedings.
In regard to the request for transcription of the off-the-record discussion, Hall's counsel stated the following at the hearing, "I've looked at these particular instances where we held off-the-record discussions and I have to agree that I do not recall a single one of those instances involving a something that needed to be on the record. There was one instance where we held held an off the record discussion where you told us ifif we determined that it needs to be on the record later, we'll put it back on the record."
There is absolutely nothing that suggests that the trial court erred in denying the motion to supplement. Hall cites no instance on appeal where this Court could not adequately review issues raised on appeal because of the alleged incomplete record.

Appellate Review

XVIII.
As required by § 13A-5-53, Code of Alabama 1975, we will address the propriety of Hall's conviction and sentence to death by electrocution. Hall was indicted and convicted of capital murder as defined in § 13A-5-40(a)(3), i.e., murder during the course of a burglary.
The record reflects that Hall's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
A review of the record shows that the trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances. The trial court reviewed all of the evidence offered in mitigation and found no statutory mitigating circumstances. The trial court found the following nonstatutory mitigating circumstances:
"The Court has also considered, pursuant to § 13A-5-52, Code of Alabama, 1975, the evidence adduced by the Defendant during the penalty phase of the trial regarding his character and record, particularly his history, his family life, and the emotional abuse suffered by the Defendant during his childhood. The Court has considered as well the efforts to ameliorate his condition which [were] made by his parents, and the many attempts to rehabilitate him. The Court has considered the love of his stepfather for him. The Court finds that these mitigating circumstances exist."
The trial court found as aggravating circumstances that the murder was committed during the course of a burglary, § 13A-5-49(4), and that the murder was "especially heinous, atrocious or cruel" as compared to other capital murders. § 13A-5-49(8). The court weighed the mitigating and the aggravating circumstances and sentenced Hall to death. We agree with the trial court's findings in the present case.
However, pursuant to § 13A-5-53(b)(2), this Court must independently weigh the aggravating and the mitigating circumstances to determine the propriety of Hall's death sentence. After an independent weighing, this Court is convinced, as was the trial court, that Hall's sentence of death is the appropriate sentence in this case.
Section 13A-5-53(b)(3) also provides that we must address whether Hall's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Hall brutally murdered a 69-year-old woman, on her birthday, while she was alone in her home. Hall's sentence is neither disproportionate nor excessive, when compared to sentences in similar cases. See Hutcherson v. State, 727 So.2d 846 (Ala.Cr.App.1997) and Land *152 v. State, 678 So.2d 201 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), and cases cited therein.
Last, we have searched the entire record for any error that may have adversely affected Hall's substantial rights and have found none. Rule 45A, Ala.R.App.P.
Hall's conviction and sentence of death by electrocution are due to be, and are hereby, affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, BASCHAB, and FRY, JJ., concur.[12]
COBB, J., recuses herself.
NOTES
[1] Travis's capital murder conviction and death sentence were affirmed by this Court. Travis v. State, 776 So.2d 819 (Ala.Cr.App. 1997). The Alabama Supreme Court granted certiorari review on February 13, 1998.
[2] When the trial court was hearing evidence on this motion, it noted for the record that the Monroe Journal traditionally printed a list of the prospective jurors who were called for service on a given date.
[3] The prosecutor argued at the motion hearing that § 15-2-24, Ala.Code 1975, forbids a trial court from transferring a case to a different county more than once. This section states, in part: "When a change of venue is authorized, the trial must be removed to the nearest county free from exception, and it can be removed but once." (Emphasis added.) The trial court noted that "The Court consider that due process outweighs the statutory law of Alabama. In other words, the Defendant's right to constitutional due process outweighs the law of the State of Alabama in regards toto this question." We agree. See Hines v. State, 384 So.2d 1171 (Ala.Cr. App.), cert. denied, 384 So.2d 1184 (Ala. 1980), where we stated, "The statutory restrictions of Alabama Code 1975, Section 15-2-24, allowing only one change of venue, cannot be construed as operating to deny an accused his constitutional right to a fair trial."
[4] Because this juror was the last strike exercised by the State, he would be an alternate.

"As provided in Rule 18.4(g)(3), [Ala.] R.Crim.P., `The last person or persons struck shall be the alternate or alternates....' Thus, the trial court should view the alternate jurors as having been struck for purposes of Batson and this court must `evaluate the State's explanation for striking [the alternate].' Ex parte Bankhead, 625 So.2d 1146, 1147 (Ala.1993)."
Ashley v. State, 651 So.2d 1096, 1099 (Ala.Cr. App.1994).
[5] We question whether Hall has standing to challenge the search. Subsequent to the release of Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the standard used to evaluate standing is whether the person challenging the search has a reasonable expectation of privacy in the area searched. It is hard to imagine how Hall would have a reasonable expectation of privacy in Shiver's yard. Because of our disposition of this issue, however, we need not address whether he had standing.
[6] There was evidence presented that Haskew owned a truck and a car and that someone had attempted to "hot wire" the truck but was unsuccessful.
[7] Hall was tried before the Alabama Supreme Court adopted the Alabama Rules of Evidence, effective January 1, 1996. Currently, introduction of this type of evidence would be governed by Rule 404(b), Ala.R.Evid.
[8] Hall questions whether the gun used in the murder was indeed the same gun taken in the Schad burglary, based on the fact that Nellie Schad's husband, Ed Schad, had furnished police with an invoice for the stolen gun, and when in his testimony he read the serial number on the invoice it was one digit different from the serial number on the gun found in Haskew's car and identified as the murder weapon. However, the trial court stated for the record: "[t]he revolver was identified by its serial number by Nellie Schad's ex-husband Ed Schad who produced a receipt for the pistol which contained its serial number."
[9] Haskew was a retired schoolteacher.
[10] Copies of the newspaper articles contained in the transcript indicate that the prosecutor is credited with having made the challenged remarks.
[11] Sneed and Hardy were tried jointly for capital murder.
[12] Although Judge Baschab and Judge Fry were not members of this Court when this case was orally argued, they have reviewed the recordings of the oral argument.